1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

STEVE HERGENROEDER; JULIE
HERGENROEDER; MATTHEW
HERGENROEDER, a minor, by and
through his Guardian Ad Litem
JULIE HERGENROEDER;
CHRISTOPHER HERGENROEDER, a
minor, by and through his
Guardian Ad Litem JULIE
HERGENROEDER; MICHAEL
HERGENROEDER; NATALIE CRAWFORD
HERGENROEDER; AND SHELBY
HERGENROEDER, a minor, by and
through her Guardian Ad Litem
NATALIE CRAWFORD HERGENROEDER

                    Plaintiffs,

        v.

TRAVELERS PROPERTY CASUALTY
INSURANCE COMPANY; and DOES 1
through 20, inclusive,

                    Defendant.

1:06-CV-1232 OWW-SMS

MEMORANDUM DECISION RE
GRANTING IN PART AND DENYING
IN PART DEFENDANT TRAVELERS'
MOTION FOR SUMMARY JUDGMENT
(DOC. 19)

## 1.  INTRODUCTION

Defendant Travelers Property Casualty Property Insurance
Company ("Travelers") moves for summary judgment or partial
summary judgment pursuant to Federal Rules of Civil Procedure 56,
to adjudicate Plaintiffs' Steve Hergenroeder, Julie Hergenroeder,
Matthew Hergenroeder (a minor), Christopher Hergenroeder (a
minor), Michael Hergenroeder, Natalie Crawford Hergenroeder and
Shelby Hergenroeder (a minor) (collectively, "Plaintiffs")
complaint for claims related to their home owners' insurance,

1

Travelers, response to their December 14, 2004 water flooding incident at their home which resulted in Plaintiffs being unable to remain in their home for almost a year.  Plaintiffs' complaint alleges (1) breach of contract, (2) bad faith, (3) intentional infliction of emotional distress, (4) negligent infliction of emotional distress, (5) negligence, and (6) negligent interference with prospective economic advantage.  The matter was heard on April 7, 2008.

## 2.   PROCEDURAL BACKGROUND

This suit was removed on September 8, 2006 from Fresno County Superior Court to the U.S. district court for the Eastern District of California by Defendant Travelers on the basis of diversity of the parties and the amount in controversy exceeeds $75,000, exclusive of interests and costs. (Doc. 1, Notice of Removal)  Defendant filed a motion for summary judgment on January 30, 2008 and January 31, 2008, including its statement of undisputed facts. (Doc. 19, Motion for Summary Judgment and Doc. 21, DSUF)[1]  Plaintiffs filed their opposition to Travelers' Motion for Summary Judgment on February 29, 2008, including their statement of undisputed facts. (Doc. 49, Opposition and Docs. 50-

---

[1] Plaintiffs argue that due to the fact that most but not all of Defendant Travelers motion for summary judgment papers were filed on January 31, 2008, not January 30, 2008 the deadline for filing dispositive motions, the Court should not even consider the motion on its "merits".  Defendant Travelers however, filed its notice of motion, motion for summary judgment, statement of undisputed facts and declarations on January 30, 2008.  Then after experiencing technical difficulties filed their remaining motion for summary judgment papers, including their proposed order and exhibits on January 31, 2008.  Plaintiffs' objection is OVERRULED.

52, PSUF)  Defendant filed its reply to Plaintiffs' Opposition on
March 10, 2008. (Doc. 57, Reply)

### 3.   JURISDICTION AND VENUE

Plaintiffs are citizens of California. (Doc. 1, Notice of
Removal, ¶ 7)  Defendant is a corporation duly organized under
the laws of the State of Connecticut, with its principal place of
business in the State of Connecticut (*Id.*)  The Complaint seeks
damages in excess of $75,000, exclusive of interest and costs, as
Plaintiffs claim Travelers is liable for damages in excess of
$870,290.00.  Jurisdiction exists under 28 U.S.C. § 1332.

Venue is proper in the Eastern District of California,
pursuant to 28 U.S.C. § 1391, because Travelers is subject to
personal jurisdiction in this judicial district and a substantial
part of the events or omissions giving rise to this lawsuit
occurred in the Eastern District of California

### 4   FACTUAL HISTORY

A. UNDISPUTED FACTS

I. Policy

Travelers issued homeowners insurance Policy No. 977816231-
633-1, effective November 13, 2004 to November 13, 2005, to
Plaintiffs to insure residential property located at 2145 Bedford
Avenue, Clovis, California ("Property").[2] (Doc. 21, Defendant's
Statements of Undisputed Facts "DSUF" 1)

II.   December 14, 2007 Water Loss at the Property (the
      Hergenroeder's Home)

---

[2] Including personal property owned or used any insured
while it is anywhere in the world and coverage for fair rental
value.

1    During the night or the early morning hours of December 14,

2    2004, Julie and Steve Hergenroeder's son, Christopher

3    Hergenroeder used the upstairs bathroom of the Hergenroeders'

4    home. (Doc. 52, Plaintiffs' Additional Statement of Disputed

5    Facts, "PSAUF", 1)  The toilet clogged, and kept running. (PSAUF

6    2)  As the Hergenroeders slept, the water continued to run.

7    (PSAUF 3)  By the time the Hergenroeders awoke, there was "water

8    everywhere," including standing water in the upstairs bathroom

9    floor, ½ inch to 2 inches deep. (PSAUF 4)

10    Ms. Hergenroeder woke up around 6:30 a.m. or 7:00 a.m., when

11    she heard water running and discovered that the carpet outside

12    the upstairs bedroom was wet and saw that the water was running

13    in the bathroom. (DSUF 46-47)

14    When she entered the bathroom, Ms. Hergenroeder observed

15    that there was about half an inch of water. She turned off the

16    water valve under the toilet. (DSUF 50)  Ms. Hergenroeder

17    observed that the linoleum floor in the bathroom was wet.  She

18    observed that the upstairs carpet in the hallway outside the

19    bedroom was wet.  The carpet on the stairs was wet all the way

20    down the stairs in the hallway. (DSUF 51)  After closing the

21    valve, Ms. Hergenroeder woke up her husband and they went

22    downstairs. (DSUF 52)  When Ms. Hergenroeder went downstairs, she

23    observed:

24            •"it was raining in the family room."
             • "The ceiling was all… it looked wet and it had like
25            beads of water, like where there might be seams or
              something in the ceiling. It looked like there were
26            strips of water and there was a vent over the sofa and
              the water was just pouring out of the vent."
27            •"Everything was wet. All the furniture was wet. My son
              had some books on the couch that were completely wet.
28            Everything was wet."

**4**

1   **(DSUF 53)**

2       **Matthew Hergenroeder saw water all over the downstairs**

3   **floor, "[i]t was a pool of water like you walked in water. It**

4   **splashed as you walk on." (DSUF 59)  The water was "slightly**

5   **discolored.  It looked like toilet water."  But he could still**

6   **see the tile through the water, "it wasn't like mud."  The**

7   **standing water in the downstairs bedroom went over Steve**

8   **Hergenroeder's shoe, maybe 2 inches deep. (PSAUF 6)  The standing**

9   **water in the family room, bathroom and kitchen was between 2 and**

10  **3 inches deep. (PSAUF 7)**

11      **There was "brown and stuff" coming out of the bathroom on**

12  **the floor, shreds of toilet paper and what looked like feces,**

13  **liquefied brownish material mixed in all the water. (PSAUF 8)**

14  **Dark chocolate brown standing water was on the downstairs floor,**

15  **up to an inch deep in the family room. (PSAUF 11)  The furniture**

16  **in the family room was wet. (PSAUF 12)  The water caused a dirty,**

17  **musty smell. (PSAUF 13)**

18      **After looking in the family room, Ms. Hergenroeder "started**

19  **getting towels out to try to sop up the water."  She threw towels**

20  **on the floor in the family room and everywhere where there was**

21  **water: in the kitchen, down the hall and on the bathroom floor**

22  **upstairs.  They used up all the towels in the closet. (DSUF 55)**

23  **After they had placed towels down and called Travelers and**

24  **Randrup, Inc., Ms. Hergenroeder made lunch for her son and took**

25  **him to school. (DSUF 58)  There was no water damage in the home**

26  **office. (DSUF 71)**

27      **III. Randrup, Inc., Water Clean-up Company**

28      **That morning, Steve Hergenroeder called Travelers' 800**

**5**

telephone claim center line to report the flood. (PSAUF 37)
Travelers had a Geo Referral List of company names in December of
2004 [when the Hergenroeders' loss occurred]. (PSAUF 41)   Mr.
Hergenroeder spoke with Felice when he called the 800 number.
"She said they didn't have anybody on their vendor list look in
the phone book.  I asked her ... I knew about Randrup's, but I
had to look their phone number up in the phone book and ... and
she said call them or someone out of the phone book."

      Mr. Hergenroeder had worked with Randrup, Inc. ("Randrup")
on one occasion prior to December 14, 2004 when he was the plant
manager at Carrington Pointe.  The pipes froze and burst during a
cold season.  Randrup was the company that came up and "sucked up
the water and all that stuff, did the restoration."  Mr.
Hergenroeder agrees that he had experience with Randrup in terms
of water cleanup and extraction. (DSUF 62)

      Randrup came the same day Mr. Hergenroeder called them.  Mr.
Hergenroeder let them in, showed them the house and "they did
their thing."  Mr. and Ms. Hergenroeder signed a contract with
Randrup to do the repair work to their home, authorizing Randrup
to proceed with work that same day that consisted of taking water
up, putting fans and tearing the ceiling out. (DSUF 63, 79)   The
Hergenroeders continued to live in, and prepare food in, their
home during December 14, 15 and 16, 2004, even while Randrup
performed demolition work. (PSAUF 88)

      Randrup set up what Mr. Permenter, Travelers' claim
adjuster, assigned to the Hergenroeders' water loss claim,
described as "blowers," "air movers" or "turbo fans." (PSAUF 55)
Mr. Permenter saw the turbo fans when he inspected the

Hergenroeders' home on December 15, 2004. (PSAUF 56)  Mr.
Permenter could not recall if those turbo fans were vented to the
outside, or filtered. (PSAUF 57)  Randrup's fans did not have
anything to vent them outside or direct air outside the
Hergenroeders' home. (PSAUF 58)

Mr. Permenter noted that Randrup's water extraction failed
to use tarps, and debris was all over the couches below and all
over the floor," to prevent further damage despite "the close
proximity of the kitchen with all this drywall and insulation
that they just demoed." (PSAUF 49)

Randrup hung a sheet of plastic between the family room and
kitchen, and did no further work on the Hergenroeders' home.
(PSAUF 93)  After stopping work on the Hergenroeders' home,
Randrup would not return phone calls from Steve Hergenroeder.
(PSAUF 94)

a.   Randrup's Discovery of Rat Nests

On December 14, 2004, Plaintiff Steve Hergenroeder was
informed by Randrup that rat nests were pulled from the ceiling
in the family room.  Mr. Hergenroeder testified that he saw a
"bunch of stuff all over the ground." but that he "did not
examine it that well." (PSAUF 15)  The rat nests contained rat
droppings and smelled bad. (PSAUF 16)

By the morning of December 15, 2004, the house started to
really smell, a musty, thick smell, even though the fans were
running.  It was starting to approach the smell of an outhouse.
(PSAUF 17)  By the morning of December 16, 2004, their home
smelled like a rabbit cage. (PSAUF 20)

IV.  Sean Permenter, Travelers' Adjuster Assigned to

7

1                   **Plaintiffs' Water Loss Claim**

2          After Plaintiffs reported their claim to Travelers, Sean

3     Permenter was assigned to investigate and adjust the claim. (DSUF

4     3)  As part of Travelers' investigation, Mr. Permenter spoke with

5     Steve Hergenroeder on December 14, 2004, and agreed to meet with

6     him at the Property on December 15, 2004. (DSUF 4)

7          On December 15, 2004, Mr. Permenter met with Mr.

8     Hergenroeder at the Property.  Mr. Permenter observed that the

9     initial water extraction had begun, and was informed by Mr.

10    Hergenroeder that Randrup performed the extraction. (DSUF 6)

11         Mr. Permenter came to understand that the water originated

12    from a toilet in the upstairs bathroom, and he inspected the

13    bathroom with Mr. Hergenroeder. (DSUF 7)  Mr. Permenter observed

14    damage to the upstairs bathroom floor, walls, carpeting in the

15    upstairs hallway, and the family room ceiling and walls.  He also

16    observed some damage to the kitchen ceiling as a result of the

17    removal of the family room ceiling done by Randrup as part of its

18    water extraction. (DSUF 10)

19         On December 16, 2004, Mr. Permenter, spoke to Mr.

20    Hergenroeder again, and Mr. Hergenroeder stated that Randrup had

21    found two large rat nests in the family room ceiling during the

22    water extraction. (DSUF 12)

23         On or about December 16, 2004, several days after the water

24    loss incident, Plaintiffs moved into a Marriott hotel. (DSUF 68)

25         On December 17, 2004, Mr. Permenter and Jeff Krebbs met with

26    Steve Hergenroeder at the Hergenroeders' home. (PSAUF 102)  Mr.

27    Permenter recalls that meeting because it was the last day prior

28    to his vacation. (PSAUF 103)

                               **8**

          a.   **Failure of Travelers to Respond to Plaintiffs'
               Telephone Call During Mr. Permenter's Vacation**

     During the week after Christmas, Steve Hergenroeder made several calls to Travelers, but no one answered his calls. (PSAUF 105)  While Mr. Permenter was on vacation, Mr. Krebs never returned calls from the Hergenroeders. (PSAUF 106)  Mr. Permenter referred to his vacation as an explanation for what he called a "huge gap" in his log notes from 12/16/04 to 12/28/04. (PSAUF 108)

     **V.   Hergenroeders Become Ill**

     On December 16, 2004, Mr. Permenter testified and indicated in his Impact Notes that he spoke to Steve Hergenroeder by phone, and Mr. Hergenroeder told him that he and the family were feeling sick. (PSAUF 89)  By the next day, each member of the Hergenroeder family was starting to feel nauseous and had diarrhea. (PSAUF 19)  The Hergenroeder family was sick "most of January."  At one point, all the boys were throwing up.  Julie Hergenroeder had diarrhea on and off for a few weeks. (PSAUF 21)  Eva Sciascia testified that one of the first questions she asks is whether the home is livable. (*See* PSAUF 85 and Doc. 59, Response to PSAUF 85)

     **VI.   Travelers' Decision to Perform Contamination Testing on
            the Property: December 28, 2004**

     On December 28, 2004, fourteen (14) days after the flood, and after Mr. Permenter returned from vacation, Mr. Permenter spoke to Steve Hergenroeder by phone and "advised [Steve] that a bio hazard inspection may be in order", testing for contamination should be performed on the Property. (PSAUF 107)  Mr. Hergenroeder informed him that he and his family were on vacation

                                        **9**

in Southern California.  Mr. Permenter advised Mr. Hergenroeder

that he would be obtaining an estimate to repair the water damage

from Puma Construction. (DSUF 19)

       After the Hergenroeders returned from vacation, Mr.

Permenter met with Mr. Hergenroeder on January 7, 2005 to discuss

the claim.  That same day  Mr. Permenter contacted another

industrial hygiene expert Troy Brooks of T. Brooks & Associates,

twenty-four (24) days after the water loss incident at the

Property.  Mr. Permenetr asked him to perform testing at the

property and to advise as to his findings. (DSUF 21)

       VII. Assignment of Claim to Eva Sciascia, Technical
            Specialist

       The Hergenroeder claim was assigned to a Technical

Specialist, Eva Sciascia, because the cost to repair the damage

to the Property exceeded Mr. Permenter's authority. (DSUF 23)

       Eva Sciascia was produced by Travelers as Travelers' "person

most qualified" to testify on each of the following

subjects:

              1. Procedures to be followed, including required
              testing and necessary disclosure to insured, in
              handling a claim for damage to property insured under a
              homeowners policy due to waste water overflowing or
              escaping from a toilet that includes human feces or
              human urine, in order to avoid causing and/or spreading
              air contamination during remediation of the property.

              2. Procedures to be followed, including required
              testing and necessary disclosure to insured, in
              handling a claim under a homeowners policy issued in
              California that involve contamination caused by rats'
              nests or rat feces, in order to avoid causing and/or
              spreading air contamination during remediation of the
              property.

              3. Procedures to be followed in regard to disclosing to
              an insured under a homeowners policy issued in
              California that additional benefits may reasonably be
              payable under the insured's policy upon receipt of

1          additional proofs of claim.

2          **4. Any guidelines or procedures regarding when the St.**
3          **Paul Travelers Industrial Hygiene Laboratory will be**
           **involved in the handling of a claim or when a St. Paul**
           **Travelers risk control consultant will be involved in**
4          **the handling of a claim.**

5          **(PSAUF 196)**

6          Ms. Sciascia was the person most qualified from Travelers to

7     testify regarding theses subjects because she handles "a lot of

8     water damage claims" and because "it's a contaminate claim."

9     (PSAUF 197)   Unit Manager John Wolford was responsible for

10    oversight of Ms. Sciascia's files, and reviewed them once each

11    month. (PSAUF 198)   Other than claims over her dollar limit of

12    authority of $60,000, Ms. Sciascia did not need Mr. Wolford's

13    approval or supervision for any other aspects of a water loss

14    claim. (PSAUF 200)   Around 12% of the claims that Ms. Sciascia

15    handled were water damage claims that involved contamination

16    caused by human feces, urine or waste. (PSAUF 202)

17         VIII.      T. Brooks & Associates: Contamination Testing

18         Travelers retained T. Brooks & Associates, an industrial

19    hygiene company, to test the Hergenroeders' home and prepare a

20    remediation protocol. (PSAUF 22)   In early January 2005, Troy

21    Brooks was asked by Travelers to assess bacterial-related issues

22    at the Property. (DSUF 82)

23         Troy Brooks is a Certified Indoor Air Quality Consultant

24    with Indoor Air Quality Association, an international

25    organization that promotes training, education and

26    professionalism related to the field of indoor air quality.  Mr.

27    Brooks also declares that he has multiple state and federal

28    accreditations in the environmental industry and has conducted

                              11

hundreds of tests and investigations involving microbial issues (fungal spores and bacteria), as well as airborne chemical hazards affecting structures. (Doc. 23, Declaration of Troy Brooks, ¶ 1)  In response to that request, on January 7 and 10, 2005, Mr. Brooks performed microbial testing at the Property, almost a month after the December 14, 2004 water loss incident. Mr. Brooks performed that testing based upon information provided to him by both Travelers and the Hergenroeders that there was a water-related loss at the Property that may have involved sewage. (DSUF 83)  Based upon these results, Mr. Brooks prepared a written scope of remediation titled "Recommended Scope of Remediation/Decontamination" for the Property.  On January 19, 2005, he sent this Recommendation to Travelers. (DSUF 85)

The remediation protocol prepared by T. Brooks & Associates for Travelers stated the following in regards to the water loss incident that occurred:

> **Background**
>
> A 'black water' sewage spill occurred within the 2nd floor bathroom within the referenced residential structure which contributed to water damage, fungal growth and suspected bacterial and possible viral contamination of undefined interior surfaces.  Baseline sampling, consisting of sewage screens, and cultured and non-cultured microbial samples has been conducted. Fungal growth is present on the drywall and possibly wood framing at 1st and 2nd floor locations wetted by the sewage spill.  Based on the results of the bacterial sewage sampling, it was determined that bacteria associated with sewage present on interior surfaces and in the air stream.  Based on rodent nest sites discovered within specified areas of structure, rodent allergens may be present on surfaces in the air stream.  Workers shall take all safety precautions and wear appropriate personal protective equipment to protect themselves against possible bacterial, viral, allergen, and fungal contamination.

(Doc. 50, Plaintiffs' Separate Statement of Disputed Facts,

"PSUF" 25)

T. Brooks & Associates recommended the following in their report:

> "Contractor shall seal all openings in walls and ceilings within containment with polyethylene film and tape."

> "Double-flapped doorway shall be provided at each entrance to containment area."

> "All remediation work will be conducted under negative air pressure. Negative pressure will be maintained until Contractor receives notification that work is deemed complete based on satisfying the post remediation sampling criteria as stipulated."

> "Contractor shall exhaust negative air machines outside structure during remediation/decontamination operations."

> "Following completion of remediation/decontamination work, outside flaps shall be taped shut and machines shall be operated in "scrub" mode until notified to disassemble containment based on satisfying prescribed clearance criteria."

> "Upon completion of remediation/decontamination phase, install clean pre-filters on air scrubbers for post remediation scrub phase."

> "Air Handling System Cleaning All ducting shall be cleaned by professional duct cleaner.  Replace all disposable filters associated with HVAC system. Thoroughly clean and decontaminate reusable filters using anti-fungal, anti-bacterial, and anti-viral cleaning agent."

(PSAUF 46-54)

Travelers never put any restrictions on the scope of Mr. Brooks' recommendations, and they agreed to each and every recommendation he made. (DSUF 91)

> a.   Gilstrap's Cleaning and Restoration Services: Remediation Services

After taking over handling the Hergenroeder claim, Ms. Sciascia contacted Troy Brooks to determine the results of his testing. (DSUF 25)  Mr. Brooks recommended to Travelers and

13

Plaintiffs a qualified remediation expert, Gilstrap's Cleaning and Restoration Services ("Gilstrap"), to perform the remediation work. (DSUF 26)  Mr. Brooks is familiar with and has worked with Gilstrap on numerous occasions.  They are known to him as a contractor that has specialized training in remediation of contaminated water losses, and his personal interaction with them has shown this to be true. (DSUF 86)  It is Mr. Brooks' understanding that Gilstrap's performed remediation at the Property based upon his Recommendation. (DSUF 87)

Upon completion of that remediation by Gilstrap's, Mr. Brooks again performed microbial testing at the Property. (DSUF 88)  The results of those tests indicated that fungal air levels were below background levels and that there were no viable levels of any sewage-related bacteria.  In other words, the test results indicated that the Property had been completely remediated. (DSUF 89)

> IX.  Ms. Sciascia's Discussions with T. Brooks & Associates and Gilstrap's Cleaning and Restoration Services on Contamination in Property

Ms. Sciascia was never trained by Travelers regarding whether the types of bacteria reflected on Troy Brooks' report could constitute any type of health hazard. (PSAUF 203)  After receiving the report from Troy Brooks which discussed the bacteria in the Property, Ms. Sciascia never asked Mr. Brooks if those bacteria presented any kind of health hazard. (PSAUF 204)  Ms. Sciascia received no training from Travelers regarding whether mold is a possible health hazard. (PSAUF 206)  Ms. Sciascia did not ask Mr. Brooks whether mold is possibly a health hazard. (PSAUF 207)

14

On February 2, 2005, Ms. Sciascia was informed by Gilstrap that they found more contamination. (PSAUF 111)  Ms. Sciascia cannot recall what he meant by "additional moisture," and cannot recall if there was any concern that additional moisture would cause or had already caused mold. (PSAUF 119)  She also cannot recall if she contacted Troy Brooks to do additional testing. (PSAUF 121)

X.    Payment of Benefits

In total, Travelers made payments totaling $333,937.31 for Plaintiffs' water loss claim. (DSUF 45)

a.    Additional Living Expenses Benefits: Hotel, Home Rental and Food Expenses - December 2004 - March 2005

At Plaintiffs' request, at the end of January 2005, a month and half after the water loss incident, Ms. Sciascia took action to direct pay Marriott hotel for additional living expenses incurred by Plaintiffs. (DSUF 37)  Moreover, at Plaintiffs' request, Travelers sought out and located a rental home acceptable to Plaintiffs, which Plaintiffs moved into the first week in March, two and half months after the December 14, 2004 water loss incident. (DSUF 38)  Travelers paid the rent on that rental home directly. (DSUF 39)  In total, Travelers paid $47,021.84 for the additional living expenses portion of Plaintiffs' claim. (DSUF 41)

As of December 21, 2004, Mr. Wolford, of Travelers, noted in his Impact Notes that Steve Hergenroeder told Travelers they had to extend their stay in the hotel because their home was still not habitable. (PSAUF 138)  The Impact Notes state that the insured (the Hergenroeders) had been in the hotel for five days

15

and their hotel bill totaled $806.88.  Travelers "projected" the Hergenroeders' hotel stay through January 1, 2005, (but deducted the days the Hergenroeders would be on vacation from 12/26 to 12/29). (PSAUF 139)  Travelers' Impact Notes also state that the insureds informed Travelers it was "nearly impossible" for the them to cook meals for all six family members in a single hotel room and Travelers' Impact Notes reflect their agreement to advance the insureds (the Hergenroeders) $50 per day for food for all six members of the Hergenroeder family. (PSAUF 140)

Travelers' Impact Notes also calculate that the Hergenroeders had already incurred $780.90 in hotel bills, and projected the hotel bill for 13 more days [$1,249.44] and "food" at $50 per day for all six family members for 13 days [$650.00]. Travelers' entry in its Impact Notes, noted this amount includes a "partial food expense."  Travelers' Impact Notes state they paid the insureds an "advance" of $2,680.34. (PSAUF 141)  This "advance" consisted of the Hergenroeder's hotel bill through January 1, 2005.

Plaintiffs allege this was based on one hotel room for six people costing the Hergenroeders $156.18 per night. Plaintiffs allege the purported "advance" payment did not pay for the prior five days of food expenses already incurred during their stay in the hotel.  And the purported "advance" payment included $780.90 in hotel expenses already incurred. (PSAUF 141)

On January 27, 2005, Travelers' Impact Notes, noted that Mr. Wolford spoke to Steve Hergenroeder, who told Mr. Wolford that the #1 issue was that the Hergenroeders needed some money soon because their credit cards were maxed out. (PSAUF 142)  On

16

January 28, 2005, the Impact Notes reflect that Mr. Wolford approved an ALE payment of only $425.35. (PSAUF 144)  According to the letter stated in the Impact Notes from the Hergenroeders, dated January 30, 2005, that amount did not even cover the hotel bill, and was "salt in their wounds." (PSAUF 145)

On or about January 28, 2005, a month and a half after the December 14, 2004 water loss incident, Travelers issued several reimbursement checks to Plaintiffs.  Only one check paid benefits for costs Plaintiffs were seeking reimbursement on through receipts:

> (1) $1,964.60 for the emergency clean-up performed by Randrup;
> (2) $13,158.48 for the actual cash value of the rebuild estimate provided by Randrup;
> (3) $13,818.75 for the actual cash value of the cost to replace the tile floor; and
> (4) $424.35 for additional living expense, which reflected the amount Travelers determined Plaintiffs were owed based upon the receipts and bids they had submitted to Travelers. (DSUF 30)

On February 2, 2005, Travelers issued another check

> (1) $4,606.25, for the holdback amount of the cost to replace the tile. (DSUF 31)

Travelers issued another additional living expense reimbursement check in the amount of $2,297.38 on March 11, 2005. (DSUF 17)

### b.   Payment for Services

Randrup submitted to Travelers a (revised) reconstruction bid/estimate on April 18. 2005,  which Travelers accepted. (DSUF 32-34)  Pursuant to the terms of the Policy, Travelers agreed to pay the actual cash value of this amount, or $136,347.89, less the $31,583.48 already advanced to Plaintiffs, for a total amount of $104,764.41.  Travelers issued a check to Plaintiffs on or

17

about April 21, 2005 in- this amount. (DSUF 34)  Steve Gilstrap was paid for all work related to the Hergenroeder matter. (DSUF 64)  Thereafter, Travelers issued additional checks for miscellaneous items, such as damage to Plaintiffs' lawn during reconstruction.  In total, Travelers paid $175,419.36 for the building loss portion of Plaintiffs' claim. (DSUF 36)

c. Personal Property Benefits: Sentimental Items

Travelers had a duty not to misrepresent the scope of coverage afforded by the Travelers policy. (PSAUF 135)  The Hergenroeders' policy with Travelers provided "Contents" coverage for damage to personal property. (PSAUF 165)

On October 21, 2005, almost a year after the December 14, 2004 water loss incident, Plaintiffs submitted to Travelers a seventy-eight (78) page list of personal property contents they claimed were destroyed by Gilstrap's as part of the remediation process, totaling $52,339.96.

Due to the volume of items, Travelers forwarded the list to Global Resources, a company that specialized in pricing voluminous contents claims.  Because of the volume of contents, the evaluation and pricing of the items would take some time, therefore on or about December 9, 2005, Travelers issued an advance to Plaintiffs for their destroyed contents in the amount of $30,000.00, almost a year to the date of the water loss and about a month and half after the Plaintiffs sent their Personal Property Inventory Worksheet. (DSUF 43)

d.   Rental Loss Benefits: Home Office

The Hergenroeders' policy with Travelers provided coverage for "Fair Rental Value." (PSAUF 192)  Julie and Steve

18

Hergenroeder own a business, Hergie Associates dba Garden Terrace Assisted Living ("Hergie Associates").  They also own two residences (other than the one affected by this claim) that they rent to Hergie Associates for use as residential care facilities. The Hergenroeders have written rental contracts with Hergie Associates for these two properties, under which Hergie Associates makes fund transfers from its business bank account to the Hergenroeders' personal bank account in the amount of $2,400.00 per month for each residence, for a total of $4,800.00 per month.(DSUF 57)[3]

There is no written agreement between the Hergenroeders and Hergie Associates with respect to the rent of the home office. Other than accounting information, there is no other corporate documentation used to substantiate the payment of rent as an expense of the corporation. (DSUF 69)[4]  Travelers has not paid

_____

[3] **Plaintiffs object on the grounds that the multiple facts regarding Hergenroeders' assets and finances are irrelevant and immaterial to any issue in this motion.  Defendant responds that this information relates directly to Hergenroeders' claims at issue, specifically claims for loss of rents and business property and shows that Plaintiffs had written rental agreements between themselves and their company for their other property, but not for the allegedly rented office space in their home. Relevant evidence is any evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without evidence. Fed. R. Evid. Rule 401.  Plaintiffs' objection is OVERRULED.**

[4] **Plaintiffs object on the grounds that to the extent this fact is meant to refer to the content of a tax return, any information regarding the Hergenroeders' tax returns is privileged and this is irrelevant, immaterial to any issue presented in this motion.  Plaintiffs' citation to Cal. Rev. & Tax C. Section 19452 is not controlling, as it is completely**

19

Plaintiffs for the alleged ten months of rent they lost from Hergie Associates after the Property, including the home office, became uninhabitable after the December 14, 2004 water loss incident. (PSAUF 194)

            i.    The Hergenroeder's Accountants

Mr. Griffin is Plaintiffs' accountant. He does Plaintiffs' business accounting, personal accounting, and tax preparation. Prior to Ms. Griffin, David Slosberg was Plaintiffs' accountant. (DSUF 70)   Mr. Griffin prepared two years worth of returns for

inapplicable to these facts. Cal. Rev. & Tax C. Section 19452 makes it a misdemeanor offense for state officials and employees to disclose certain information contained within tax returns. Such facts are not before the Court. More importantly, and precisely on point, any privilege alleged by Plaintiffs concerning the tax returns has been waived. It is well settled that when the holder of a privilege voluntarily discloses the privileged material, the voluntary disclosure constitutes a waiver of the privilege. 26A Wright and Graham, Federal Practice and Procedure Section 5726 (1992). Furthermore, where the client allows its agent to produce privileged materials, the client is deemed to have waived the privilege. *In re von Bulow*, 828 F.2d 94, 100-101 (2nd. Cir. 1987). Here, it is undisputed that, in response to a subpoena, Mr. Slosberg, produced the documents to which Plaintiffs have now asserted a privilege. However, Plaintiffs made no motion to quash the subpoena, and they made no motion for a protective order. Once a privilege is waived, it may no longer be asserted. *United States v. Suarez*, 820 F.2d 1158, 1160 (11th Cir. 1987), cert. denied, 508 U.S. 920, 113 S.Ct. 2367. Therefore, even if there were a privilege to assert concerning the tax returns (which Plaintiffs have failed to demonstrate), any such privilege has been waived by the voluntary disclosure and may not now be asserted. Travelers also argues that the fact is material and relevant as it is indicative of whether or not Plaintiffs suffered the lost rent they are now claiming in this lawsuit.  Relevant evidence is any evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without evidence. Fed. R. Evid. Rule 401.  Plaintiffs' objection is OVERRULED.

both the Hergenroeders and Hergie Associates.  The Hergie
Associates general ledger submitted to him by the Hergenroeders
showed annual lease payments for the two homes, and the $4200 for
a lease payment on an automobile. (DSUF 81)

> **e.   Business Property Benefits: Office Supplies and
> Documents Destroyed by Contamination**

The Hergenroeders' policy with Travelers provided coverage
for loss of "Business Property," up to the amount of $5,000.
(PSAUF 175-177)  The Hergenroeders' home office contained various
and voluminous business records, including: client files,
business forms that the Hergenroeders had developed over the
years, business receipts, tax returns, business signs, business
cards, marketing materials, and other business records. (PSAUF
179)  As part of the remediation clean-up, the Hergenroeder's
copier was cleaned, but when it was returned, it no longer
worked. (PSAUF 190)  Plaintiffs' home office desk and computer
were removed, cleaned and returned by Gilstrap's. (DSUF 56)

> **XI.   Travelers Procedures for Water Loss Claims**

Travelers' claims handling guidelines are called "Best
Practices."  These "Best Practices" contain no specific
provisions or sections that deal with water damage claims. (PSAUF
27)  Eva Sciascia was designated by Travelers as its "person most
qualified" to testify regarding claims handling procedures
associated with water loss claims. (PSAUF 69)

An insurance company has a duty to provide the insured with
"necessary form, instructions and reasonable assistance" per 10
C.C.R. § 2695.5(e)(2), which states: "(e) Upon receiving notice
of claim, every insurer shall immediately, but in no event more

21

than fifteen (15) calendar days later, do the following unless
the notice of claim received is a notice of legal action: (1) ...
2) provide to the claimant necessary forms, instructions, and
reasonable assistance, including but not limited to, specifying
the information the claimant must provide for proof of claim ..."
Cal.Code Regs.tit. 10, § 2695.5(e)(2). (PSAUF 36)

     Travelers' claims personnel, including Mr. Permenter and Ms.
Sciascia, were trained by Travelers that an insurance company has
an obligation to conduct a thorough investigation, both under
Travelers' own "Best Practices" and the Fair Claims Settlement
Practices Regulations. (See, 10 C.C.R. §§ 2695.5(e), 2695.7(d))
(PSAUF 68)  Travelers' claims handling procedures also require
the claims representative to ask as many questions as they can to
get as much detail about the claim as possible. (PSAUF 70)

     While Mr. Permenter told Steve Hergenroeder on December 14,
2004 to prepare an inventory of damaged items, Mr. Permenter did
not recall ever sending an inventory sheet or any other similar
form or document to the Hergenroeders. (PSAUF 110)

     Mr. Permenter and Ms. Sciascia were trained annually by
Travelers, both in regard to Travelers' "Best Practices" and in
regard to the Fair Claim Settlement Practices Regulations, that
an insurance company is required to explain all applicable
coverages to its insured. (PSAUF 123)  Mr. Permenter and Ms.
Sciascia were trained by Travelers that an insurance company is
required to disclose all benefits and coverages that might apply
to the claim. (PSAUF 124)

     Travelers' claims handling procedures also require the
claims representative to ask as many questions as they can to get

**22**

as much detail about the claim as possible. (PSAUF 126)  Mr. Permenter said he "normally" goes over the "dec page" with the insured either in the first conversation or during their first meeting. (PSAUF 128)

Mr. Permenter, who Travelers assigned to "investigate" the claim could not recall if he even asked Steve Hergenroeder if the flood water had any fecal material or discoloration that might be urine in the water. (PSAUF 71)  Mr. Permenter testified that he understood that meant "the water - - it didn't flush.  It didn't go down." (PSAUF 83)

B. DISPUTED FACTS

 I. December 14, 2007 Water Loss at the Property (the Hergenroeder's Home)

  a. Telephone call to Travelers' 800 Number

During the 800 number phone call to Travelers, Mr. Hergenroeder advised Travelers that he would call out to Randrups Fire and Water Restoration. (DSUF 2)  Plaintiffs allege that the woman who answered the 800 line informed Mr. Hergenroeder that Travelers did not have the name of a water extraction and emergency clean-up company in the Hergenroeders' zip code in Clovis, or in the two adjacent zip codes.  Mr. Hergenroeder had to look up Randrup's phone number in the phone book. (PSUF 2) Defendant claims that Mr. Hergenroeder testified that the Travelers representative suggested that he call either Randrups - whom Mr. Hergenroeder was aware of- or another company in the phone book. (Doc. 59, Travelers' response to PSAUF 39)

 II. Timing of Travelers' Knowledge Toilet Over-Flow Contained Human Waste

Plaintiffs cite the following from Travelers' Impact Notes

23

and Mr. Permenter's deposition, providing indication that Mr.
Permenter should have been aware that the toilet overflow
involved human waste:

> 1) Travelers' "File Gen Remarks Note" describes the
> water source as "pipe clogged – overflow." (PSAUF 79)
>
> 2) That same report says, "Clogged –Inside House: Y
> [yes]." (PSAUF 80)
>
> 3) Mr. Permenter testified that when he spoke to Steve
> Hergenroeder on December 14, 2004, Steve Hergenroeder
> told him that the "upstairs bathroom toilet backed up"
> and overflowed while he and his wife were sleeping."
> (PSAUF 81)
>
> 4) Mr. Permenter's Impact Notes state Steve
> Hergenroeder told Mr. Permenter, the toilet "must have
> backed up, and the water didn't go down, and kept
> spilling out." (PSAUF 82)

Despite the information that the toilet had "clogged," had
"backed up and overflowed" and that it "didn't flush" and the
water "didn't go down," but instead "continued to run," Travelers
did not contact an industrial hygiene expert to test for
contamination until December 28, 2004, fourteen (14) days after
the flood and twelve (12) days after they reported to Travelers
the family was ill. (PSAUF 84)

Defendant contends that during the December 15, 2004
meeting, none of the Plaintiffs ever mentioned or indicated to
Mr. Permenter in any manner that the water might have contained
any sewage or feces.  Based upon Mr. Permenter's conversation and
inspection of the property with Mr. Hergenroeder, it was his
understanding that the water was simply from an overflow of water
from the "clean" water supply line to the toilet. (DSUF 8, 9)
Defendant alleges that a meeting on December 17, 2004, Mr.
Hergenroeder stated for the first time that he believed the water

overflowed from the toilet had contained human feces. (DSUF 15)

Plaintiffs allege it was Travelers' responsibility to ask if there was sewage involved.  Travelers had sufficient information provided to Mr. Permeneter to notify him of the situation.

III. Rat Nests

Defendant contends that Mr. Permenter did not observe any rat nests or any evidence of rat nests, and was unaware of the existence of any rat nests. (DSUF 11)  Plaintiffs state that the rat nests were removed on December 14, 2004, and Mr. Permenter did not arrive at Plaintiffs' home until December 15, 2004. Plaintiffs cite to a report by Tony Brooks which states that rodent nest sites were discovered and rodent allergens may be present on surfaces and in the air stream. (PSUF 11)  Defendant rejoins that Troy Brooks' report was not completed on December 15, 2004, but later. (DSUF 11)

Defendant alleges that this was the first and only claim Mr. Permeneter adjusted that involved a rat's nest, so he sought advice from his Unit Manager, John Wolford.  Upon his advice, Mr. Permenter advised Plaintiffs to have Randrup return and put tarps around the family room area.  He also advised Plaintiffs that Travelers would reimburse them for additional living expenses to stay in a hotel while Randrup contained and cleaned up the debris.  The Hergenroeders moved into a motel that same day (December 16, 2004). (DSUF 13)

Plaintiffs dispute this and state that only after Steve Hergenroeder told Mr. Permenter the family was sick did John Wolford instruct Mr. Permeneter to put the insureds in a hotel for two nights.  They also allege that they were in the home,

25

preparing food and living there from December 14, 2004 through December 16, 2004 before being moved.

IV.   Response to Hergenroeders becoming Ill

While the Hergenroeders continued to live in, and prepare food in their home during December 14, 15 and 16, 2004, Randrup performed demolition work and the fans blew air and dust throughout their home. (PSAUF 88)

Plaintiffs allege that instead of Travelers hiring an industrial hygiene company to test the Property for contamination, on December 16, 2004, after knowledge that the entire Hergenroeder family had become sick, Mr. Permenter testified that Unit Manager John Wolford instructed him to have Mr. Hergenroeder "call out company to contain and clean up." (PSAUF 97)  Defendant alleges that it is undisputed that Mr. Permeneter retained Mr. Brooks to test the home for contaminants. (Doc. 59, Response to PSAUF 97)  Plaintiffs allege that Mr. Wolford's instruction regarding "clean up" did not address testing for contamination (PSAUF 98, 99)  Defendant dispute that Mr. Permenter's testimony does not state that the "clean up" had nothing to do with testing for contamination. (Doc. 59, Response to PSAUF 98, 99)

V.   Review of Policy

Defendant alleges that during a December 14, 2004 telephone conversation, Mr. Permenter reviewed Mr. Hergenroeder's Policy deductible, Policy limits and Policy coverages with him. (DSUF 5) Plaintiffs dispute this and argue that at Mr. Permenter's deposition testimony he could not recall anything said to Mr. Hergenroeder because it was three years ago and after reviewing

his notes, could not recall if he had any other discussion related to coverages under policy besides policy limit and deductible. (PSUF 5)

   VI.   Unavailability of Travelers One Week after Water Loss

   Mr. Permenter, at the December 17, 2004 meeting, informed Mr. Hergenroeder that for the next week he would be on vacation because he was moving to a new residence.  He also informed Mr. Hergenroeder that because he was moving, his phone line would be disconnected and therefore he would be unavailable.  He also informed Mr. Hergenroeder that Mr. Krebs and his manager, Mr. Wolford, would be available to assist with his claim while Mr. Permeneter was moving. (DSUF 14)  Plaintiffs contend that while Mr. Permeneter was on vacation, Mr. Krebs never returned calls from Steve Hergenroeder. (PSUF 14)

   VII.   Payment of Policy Benefits

      a. Additional Living Expenses Benefits

   Plaintiffs allege that up until the phone conversation on December 16, 2004 when Steve Hergenroeder told him that the whole Hergenroeder family was sick, no one from Travelers mentioned the "Additional Living Expense" coverage to the Hergenroeders. (PSAUF 90)  After Steve Hergenroeder told him that the Hergenroeder family was sick, Unit Manager, John Wolford, instructed Mr. Permenter to "put the insureds up in a hotel for two nights until containment decontamination is completed." (PSAUF 91)

   In regards to the December 21, 2004 "advance payment" of $2,680.34, two week after the December 14, 2004 water loss, Plaintiffs contend that this was not an advance payment as Plaintiffs had already incurred $806.88 in hotel bills.

Defendant's projected that Plaintiffs would be in the hotel until January 1, 2005.  Plaintiffs contend that if you calculate the past hotel bill, $806.88 and the projected costs for staying in the hotel until January 1, 2005, along with past and projected food bills, the advance payment did not cover the Plaintiffs' past and projected expenses through January 1, 2005. (PSUF 16) Defendant alleges that various checks were issued within days of Travelers' receipt of the proof of incurred expenses.  Moreover, by that time, Travelers was directly paying Plaintiffs' rent on their rental home. (DSUF 17)  Plaintiffs contend that Travelers does not assert how many days within receipt of Plaintiffs' documentation, including receipts, that they paid the benefits. (PSUF 17)

Plaintiffs contend by January 28, 2005, the hotel bills would have added up to $4,216.86.  And the partial food expense, the Hergenroeders were allotted $50/day for the entire six-member family, added up to $1,350.00.  In total, hotel and food added up to $5,566.86 and Mr. Wolford only approved an ALE payment of $425.35. (PSUF 17)

According to the Impact Notes, on January 24, 2005, the Hergenroeders sent a 7-page fax to Ms. Sciascia at Travelers, with their hotel bills from 12/16/04 through 1/23/05.  And on January 26, 2005, the Hergenroeders sent a 33-page fax to Ms. Sciascia at Travelers, which included many receipts for ALE expenses, including hotel and food expenses.  The hotel bills alone amounted to $3,992.76. (PSAUF 146)  The Travelers' Impact Notes include only pages 20 to 33 of that 33-page fax.  The Impact Notes, contain a letter written on February 2, 2005 by Ms.

28

Sciascia to the Hergenroeders, denying she received any receipts for food and gas; Ms. Sciascia never admitted receiving the pages of the fax related to the motel bill of nearly $4,000.00, and she took no steps to process the motel bills that she did receive. (PSAUF 148)

Defendant alleges that Travelers reimbursed Plaintiffs for all of the receipts they tendered for all of their additional living expenses, including but not limited to additional food, gasoline and utility bills, and reimbursed Plaintiffs for meals and drinks Plaintiffs had at restaurants during their Hawaiian vacation. (DSUF 40)

      b.   Personal Property Benefits

On page 55 of the "Personal Property Inventory Worksheet" submitted by Hergenroeders, (as provided in Travelers' Impact Notes, Exhibit 129, HER CLM 000035-110, at page HER CLM 000088), the Hergenroeders wrote:

> I DO NOT EVEN KNOW HOW TO PUT A PRICE ON THESE ITEMS AS THEY ARE IRREPLACEABLE – THEY HOLD ONLY SENTIMENTAL VALUE Variety of ribbons, white Item – According to the pictures, this is a box that was full of my school papers, 4-H and FFA ribbons and memories. The white item is my 4-H hat.  These are items that I will never be able to replace.  In the pictures of the stuffed animals, I saw the 2 stuffed dolls that 2 of my children made in school. These are irreplaceable. There was also a Heart Shaped Chocolate Box.  This was the box from the candy that Steve gave me on our first Valentines Day.  It has sentimental value and can never be replaced.

(PSAUF 167)  Similarly, on January 9, 2006, the Impact Notes reflect that the Hergenroeders submitted a "final" inventory of personal property items which were destroyed because they were contaminated. (PSAUF 168)  The Impact Notes reflect that the list the Hergenroeder's provided includes the following entry:

> All the ornaments that our children have made over the years were destroyed. The first year that Steve and I were married, I was working as a cashier at a store in Fresno called Ardan's. Steven would come to the store and buy an ornament kit just so he could go through my cash register to see me. He took all those ornament kits and hand painted them for me. There is no way for me to put a price on any of those items.

(PSAUF 169)  According to testimony of Eva Sciascia, the procedure at Travelers when the insured says they lost something of sentimental value, is to ask the insured to provide a value, but Ms. Sciascia can't recall if she asked the Hergenroeders to put a value for certain ornaments. (PSAUF 170)  Plaintiffs contend that Eva Sciascia never asked Julie Hergenroeder to value any of the items Julie did not put a dollar value on any of them. (PSAUF 171)

    Plaintiffs dispute that Travelers paid for "all" benefits due under the Contents coverage as Plaintiffs were not paid for nor informed of their ability to be paid for items of sentimental value. (PSUF 18)

    Defendants contend that the fact that on or about December 22, 2005, Travelers issued a check to Plaintiffs in the amount of $21,165.02 for the remaining actual value of the destroyed contents, including all of the "office" contents listed on page 48 of the October 2005 list submitted by Plaintiffs demonstrates they paid benefits under the policy.  In total Travelers paid $111,496.11 for the personal property contents portion of Plaintiffs' claim. (DSUF 44)

        c.    Rental Loss Benefits

    The Hergenroeders' February 3, 2005 letter to Gene Wilson of Travelers, as documented in Travelers' Impact Notes, included a

breakdown of their average monthly living expenses, and
specifically referenced: "Loss of rent that our Corporation
normally pays us for our home office: $500.00." (PSAUF 133)
Plaintiff Steve Hergenroeder alleges in his declaration no one
ever explained the "Business Property" coverage or the "Fair
Rental Value" coverage in their Policy with Travelers. Therefore
they did not submit a claim for those types of losses. (Doc. 53,
Declaration of Steve Hergenroeder, ¶ 2 and PSAUF 136)

Plaintiffs allege that the Hergenroeders' corporation paid
them $500 per month to rent the home office; this was not done
via cash, but by the Hergenroeders using their business credit
card for personal items, then making a credit transfer to pay the
rent. (PSAUF 193)

i.   Accountants' Knowledge of Home Rent

Defendant contends that Plaintiffs never told Mr. Slosberg,
Plaintiffs' accountant, nor provided him with any information
that Hergie Associates paid any sort of rent to the Hergenroeders
for rental of the home office. (DSUF 77)  Plaintiffs dispute this
and state that Mr. Griffen, Plaintiffs' CPA after Mr. Slosberg,
testified that he saw that Plaintiffs had taken a deduction for
the home office in the past, and instructed them to stop, based
on recent tax regulation. (PSUF 77)  Defendant contends that Mr.
Griffen, did not recall a conversation with Plaintiffs pertaining
to rental of the office space at their home.  According to Mr.
Griffen the tax returns for 2005 and 2006 do not reflect income
from Hergie Associates' rent of the home office space. (DSUF 80)
Plaintiffs dispute this fact and state that Mr. Griffen was asked
if he remembered a "specific conversation" and replied with

31

"kinda." (PSUF 80)

        d.   Business Property Benefits

    According to the remediation protocol developed by the industrial hygienist company, T. Brooks & Associates, all porous items, including papers, in the home office had to be destroyed. (PSAUF 180)  Gilstrap's Crew Instruction Sheet [Gilstrap production, 000165] is the first page of a lengthy inventory prepared by Gilstrap personnel when they removed everything from the Hergenroeder home.  The section titled "Upstairs Office Area; Furniture & Boxes" contains the following list of items:

```
            Rocking Chair
            Office Chair
            2 Beige Chairs
            #1 Office Supplies, Large
            #2 Sealed Inventory, Small
            #3 Breakables, Large
            #4 Breakables, Large
            #5 Electronics, Large
            #6 Books, Large
            #7 Misc. Inventory, Large
            #8 Bibles, Small
            #9 Paper Work, Large
            #10 Misc. Papers, Large
            Filing Cabinet
            Organizer
            Gong
            Coffee Table
            Book Shelf
            Sewing Machine
            #11 Pamphlets, small
            #12 Pamphlets, small
            #13 Magazines, Small
            #14 Books, small
```

(PSAUF 182)

    Julie Hergenroeder testified that she was not able to remove any items from the home office after Mr. Brooks informed her not to return to the inside of her home.  Everything was left in their home office, including records and documents. (PSAUF 183 and Doc. 54, Declaration of Timothy R. Sullivan, Exhibit 1, Julie

Hergenroeder Depo., 103:7-24)   Julie Hergenroeder testified that
she had to use the Gilstrap inventory list and Gilstrap photos to
try to create a list of "Contents" and their value as requested
by Travelers. (PSAUF 184)   Julie Hergenroeder testified that
their fax machine was destroyed by Gilstrap in the process of
cleaning.   Gilstrap told her it was cheaper to replace than to
clean. (PSAUF 186)

        There is a disputed fact over whether the business documents
that were taken out of the home office a few days after the water
loss incident were ever destroyed or if they still remain in the
shed where Steve and Michael Hergenroeder originally placed them.
Steve Hergenroeder states that he never gave anyone permission to
destroy anything.   (DSUF 72)[5]   They put the documents in sealed
plastic containers and put them outside in a shed in the back.
Defendants rejoin that Steve Hergenroeder's son, Matthew
Hergenroeder, testified that to the best of his knowledge, the
documents are still in the shed. (DSUF 73).

        VIII.       Travelers' Reliance on Randrup to Properly Clean
                    Property After Water Loss

        It was Mr. Permenter's understanding from conversations with
Mr. Hergenroeder and Brian Randrup that Randrup had expertise in

_____

        [5] Plaintiffs object to this fact on the grounds it is
irrelevant, immaterial, incomplete and misleading.   Plaintiffs'
supporting evidence provides additional facts surrounding the
destruction of the documents.   Travelers argues that the fact is
material and relevant as it addresses certain elements of the
claims made by Plaintiffs to Travelers for the water loss.
Relevant evidence is any evidence having any tendency to make the
existence of any fact that is of consequence to the determination
of the action more probable or less probable than it would be
without evidence. Fed. R. Evid. Rule 401.   Plaintiffs' objection
is OVERRULED.

the area of emergency biohazard and water extraction and clean up.  Based on this expertise, Mr. Permenter relied on Randrup to complete the emergency water extraction clean up after the Hergenroeder's December 14, 2004 water loss, and to inform him of any issues with contamination. (DSUF 24)  Plaintiffs dispute this fact noting that Mr. Permenter testified and noted in his Impact Notes that the extraction method was carelessly performed and testified that he had never been involved in claims where Randrup was hired. (PSUF 24)

      a.    Travelers Fails to Question Randrup's Information

Plaintiffs and Defendant dispute whether when Randrup left the Property on December 17, 2004, the "emergency work" was done and the home was completely dried out, drywall removed and no wet portions remained in the house. (DSUF 64, 74 and PSUF 64, 74) When Mr. Permenter inspected the Hergenroeders' home on December 15, 2004, Mr. Permenter determined that the water extraction had been performed "carelessly" by Randrup. (PSAUF 48)  Plaintiffs allege that Randrup's fans contained no filter. (PSAUF 59)

Plaintiffs contend that according to Travelers' Impact Notes, Gilstrap, hired to address the contamination of the home, found further contamination as of February 2, 2005 and therefore the emergency clean-up was not complete on December 17, 2004. Further, Plaintiffs argue that according to Travelers' Impact Notes, on April 14, 2005, Gilstrap called Ms. Sciascia to discuss black mold and black water remediation and that there was additional moisture found in various rooms requiring more drywall to be removed. (PSUF 64)

In late September 2005, Ms. Sciascia spoke with Randrup to

34

confirm that the repairs were complete.  Travelers issued a check to Plaintiffs for the remaining building repaid holdback of $11,806.78. (DSUF 35)  Plaintiffs contend that repairs were not complete in September 2005 and that Jerry Randrup was aware of paint problems, stain problems and other unfinished work. (PSUF 35)

### IX.   Travelers' Reliance on Brooks and Gilstrap to Properly Test for Contaminants and Remediate Property

Based on Mr. Brooks alleged expertise, Ms. Sciascia relied on him to test the Property, analyze the results of that testing, and provide a protocol for remediation of the Property, if necessary. (DSUF 28)

It was also Ms. Sciascia's understanding from conversations with Mr. Brooks and Steve Gilstrap that Gilstrap's had expertise in the area of remediation.  Based on this expertise, she relied on Gilstrap to effectively remediate the Property pursuant to Mr. Brooks' scope and recommendation. (DSUF 29)

Defendants contend that Mr. Hergenroeder hired Gilstrap and authorized him to proceed with the work at his house. (DSUF 67) Plaintiffs contend that Ms. Sciascia's Impact Notes dated January 13, 2005 notes that Troy Brooks chose Gilstrap as the remediation company to remove bacteria. (PSUF 67)

### X. Failure to Properly Investigate Water Loss Claim

There is a dispute among Plaintiffs and Defendant as to the criteria and procedures available for Travelers' claims representatives' dealing with a water loss at a home that involves contamination.

> Plaintiffs allege that there are no set guidelines or criteria for a Travelers' claims representative to

35

follow to determine if a home is habitable after a water loss involving contamination. (PSAUF 28)

Defendant counters that Ms. Sciascia's testimony is that in determining the need for Additional Living Expense, each file is handled on a case by case basis. (Doc. 59, Travelers' response to PSAUF 28)

Plaintiffs allege that Ms. Sciascia testified that Travelers has no environmental experts within the company. (PSAUF 33)

Defendant alleges that Ms. Sciascia testified that Travelers' subrogation department does have experts but that she is not sure if they are inside experts or outside experts. (Doc. 59, Travelers' response to PSAUF 33)

Plaintiffs allege that Ms. Sciascia testified that Travelers has no industrial hygienists that work for the company. (PSAUF 34)

Defendant alleges Ms. Sciascia testified that she is not aware of any industrial hygienists that work for Travelers, not that she has affirmative knowledge that no industrial hygienists do. (Doc. 59, Travelers' response to PSAUF 34)

Plaintiffs allege that Ms. Sciascia testified that Travelers has no testing facilities that test for contamination. (PSAUF 35)

Defendant alleges that Ms. Sciascia testified that she was not aware of any testing facilities, not that she has affirmative knowledge that no facilities exist. (Doc. 59, Travelers' response to PSAUF 35)

Plaintiffs allege that Travelers' claim handling procedure for water loss was that Travelers would not hire the water extraction company, but would recommend the name of such a company if the insured asked. (PSAUF 38)

Defendant alleges that Mr. Permenter did not testify that Travelers would not hire the water extraction company. (Doc. 59, Travelers' response to PSAUF 38)

Plaintiffs allege that there is a geo referral list containing at least some of the same names now as it did in December of 2004, including Puma Construction. (PSAUF 42)

Eva Sciascia and Mr. Permenter testified that if the water was not clear they would call an expert. And if urine and/or

36

feces in the water overflowed out of the toilet, it was the type of claim where an expert would be called.  According to Eva Sciascia it is consistent with training received at Travelers. (*See* PSAUF 74, 75 and Doc. 59, Response to PSAUF 74, 75)

Ms. Sciascia's Impact Notes regarding a February 8, 2005 conversation with Mr. Brooks state, "Troy said they reinspected and found high counts of bacteria in kitchen cabinets." (PSAUF 113)  Mr. Brooks did not explain what "high counts of bacteria" meant nor did Ms. Sciascia ask.  Ms. Sciascia also did not ask if high counts of bacteria posed any health hazard. (PSAUF 114) Defendant alleges that Ms. Sciascia testified that she was relying on Brooks and Gilstrap for their expertise. (Doc. 59, Response to PSAUF 114)

On March 8, 2005, Mr. Brooks performed "post remediation sampling," and took "nonviable air samples," "bacterial air samples," and "sewage screen swabs." (PSAUF 115)  On March 11, 2005, Mr. Brooks told Ms. Sciascia that all sampling had been done for remediation clearance, meaning the remediation work was done.  Additional testing showed bacteria and mold counts were down, and the rebuild can begin. (PSAUF 116)  However, on April 14, 2005, Gilstrap called Ms. Sciascia to discuss mold and black water remediation. (PSAUF 117)  Gilstrap informed Ms. Sciascia that "there was more drywall removed due to additional moisture found in various rooms." (PSAUF 118)  Gilstrap further informed Ms. Sciascia that "Extreme damage found in kitchen and bathroom areas," but Ms. Sciascia cannot recall if she asked what "extreme damage" meant. (PSAUF 120)

XI.  Travelers Informing Plaintiffs It Was Safe to Stay in

37

Property After Water Loss

At some point Jeff Krebs told Steve Hergenroeder that he had worked with the Department of Health for many years and feces was not a contaminant.  Mr. Permenter allegedly expressed his agreement with that statement.  Both told Steve Hergenroeder that it was safe for the Hergenroeders to continue to stay in the house.  Plaintiffs allege these statements were made before his family moved into the motel and Defendant Travelers asserts it was after they moved into the motel as Plaintiffs did not meet with Mr. Krebs (along with Mr. Permenter) until December 17, 2004, after they moved to a motel. (*See* PSAUF 86, 87 and Doc. 59, Response to PSAUF 86, 87)

XII. T. Brooks & Associates: Contamination Testing

Plaintiffs allege that even after Travelers was informed the entire Hergenroeder family was ill, Travelers did not retain an industrial hygiene company to test their home for contamination nor after Mr. Krebbs and Mr. Permenter met with Mr. Hergenroeder on December 17, 2004.  Instead Mr. Permenter went on vacation for a week and only on December 28, 2004 did Mr. Permenter advise Mr. Hergenroeder that a bio hazard inspection may be in order (PSAUF 95, 102, 104, 107)  Plaintiffs allege that Mr. Permenter had the authority to order contamination testing, but did not do so. (PSAUF 96)  Defendants contend that it is undisputed that the Travelers retained T. Brooks & Associates to test the home for contaminants as stated in DSUF 21 which Plaintiffs did not dispute. (Doc. 59, Response to PSAUF 95)

XIII.     Explanation of Policy Benefits

Plaintiffs allege that Eva Sciascia, Travelers' "Person Most

38

Qualified" to testify about its claims procedures related to water losses, testified that Travelers always sends its insureds a form for a detailed list of items of contents that were damaged. (PSAUF 109)  Defendant alleges that Ms. Sciascia testified that in some instances they do not use the form. (Doc. 59, Response to PSAUF 109)

Ms. Sciascia explained that if a Travelers claims representative does not see any damage to a home office, they need not explain the policy's coverage for "Business Property" unless the insured "brings it up later." (PSAUF 125)  Defendant alleges that Ms. Sciascia testified that during her inspections she does not address areas in the home unaffected by the loss but if the insured raises the issue, she addresses it. (Doc. 59, Response to PSAUF 125)  Mr. Permenter admitted he never discussed the "Business Property" coverage with the Hergenroeders. (PSAUF 129)  Defendant alleges that Mr. Permenter testified that the insured never conveyed to Mr. Permenter that it was an issue and that there was no damage to that area of the home, so it was not addressed. (Doc. 59, Response to PSAUF 129)  Mr. Permenter also admitted he never discussed the "Fair Rental Value" coverage with the Hergenroeders. (PSAUF 130)  Defendant alleges Mr. Permenter testified that it was not an issue that had been raised. (Doc. 59, Response to PSAUF 130)

Plaintiffs allege that as shown by the inventory list, Exhibit D to Ms. Delaney's Affidavit, Travelers did not pay for the fax machine, the office shredder or the office copier. (PSAUF 187, 189, 191)  Defendant contends that the fact that the item is not on the list attached to Ms. DeLaney's affidavit is not

39

1   evidence that Travelers did not pay for the item.  In other
2   words, there is no evidence that Travelers did not pay for items
3   not on the list. (Doc. 59, Response to PSAUF 187, 189, 191)

4        XIV. Dr. Raj Banka: Mr. Hergenroeder's Exposure to TB

5        Dr. Raj Banka ordered a tuberculosis test on Mr.
6   Hergenroeder.  Mr. Hergenroeder tested positive for PPD, but not
7   a cough, and his chest test ruled out active tuberculosis, that
8   meant that Mr. Hergenroeder was not contagious for tuberculosis.
9   Mr. Hergenroeder's exposure to tuberculosis could happen any
10   place.  He could have been exposed in a mall, and he was not
11   necessarily exposed when his house was flooded. (DSUF 78)

12        XV.  Defendant's Expert: Brian Daly

13        Brian Daly is a Certified Industrial Hygienist holding the
14   position of President of Hygiene Technologies International,
15   Inc., a comprehensive health and safety consulting firm.  Brian
16   Daly is certified in comprehensive practice of industrial hygiene
17   with the American Board of Industrial Hygiene.  Mr. Daly has a
18   Bachelor of Science degree and a Master of Science degree in
19   Health Science, Environmental and Occupational Health from
20   California State University at Northridge.  Mr Daly declares he
21   is experienced in the areas of industrial hygiene, safety
22   engineering, hazard assessment, noise evaluation and control,
23   indoor air quality, injury and illness prevention, health and
24   safety training, and emergency response coordination.  Mr. Daly
25   states he has been employed professionally in the health and
26   safety field since 1980.  Mr. Daly is also a Registered
27   Professional Engineer, Safety with the State of California. (Doc.
28   24, Declaration of Brian Daly, ¶ 1)

1   Mr. Daly has reviewed the air and surface samples collected
2   by Troy Brook of T. Brooks & Associates.  None of the data
3   indicates the presence of sewage or sewage contamination from the
4   toilet overflow on December 14, 2004.  The tests show typical
5   levels of bacteria one would find in homes, particularly one that
6   had one or more pets. (Doc. 24, Declaration of Brian Daly, ¶ 2)
7   No indication is presented of a mold growth problem, nor
8   bacterial growth problem.  Any damage to the building material at
9   the Property that may be attributable to the toilet overflow is
10  limited to the water damage rather than microbial growth. (Doc.
11  24, Declaration of Brian Daly, ¶ 3)

12  In regard to the work of Randrup, Mr. Daly is of the opinion
13  that Randrup completed the dehumidification process on December
14  17, 2004 and any building material that may have remained wet
15  [after Randrup's "emergency clean-up"] would result in
16  improvement of environmental conditions as the building materials
17  dried passively without any further active dehumidification
18  measures. (Doc. 24, Declaration of Brian Daly, ¶ 4)  Any
19  additional work to remediate the water damage did not increase
20  the scope of repairs subsequent to remediation. (Doc. 24,
21  Declaration of Brian Daly, ¶ 5)

22  XVI. Plaintiffs' Expert: Michael Geyer

23  Defendant Travelers objects to all testimony from
24  Plaintiffs' expert Michael Geyer on the basis that Plaintiffs
25  have not provided facts sufficient to qualify Mr. Geyer as an
26  expert competent to testify as to industrial hygiene issues.
27  Plaintiffs have provided no affidavit from Mr. Geyer describing
28  his qualifications nor do the portions of deposition testimony

41

1  provided by Plaintiffs describe Mr. Geyer's qualifications.

2  Defendant Travelers objections are SUSTAINED.

3                     **3. STANDARD OF REVIEW**

4       Summary judgment is warranted only "if the pleadings,

5  depositions, answers to interrogatories, and admissions on file,

6  together with the affidavits, if any, show that there is no

7  genuine issue as to any material fact." Fed. R. Civ. P. 56(c);

8  *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998).  To

9  defeat a motion for summary judgment, the non-moving party must

10 show (1) that a genuine factual issue exists and (2) that this

11 factual issue is material. *Id.*  A genuine issue of fact exists

12 when the non-moving party produces evidence on which a reasonable

13 trier of fact could find in its favor viewing the record as a

14 whole in light of the evidentiary burden the law places on that

15 party. *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216,

16 1221 (9th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*,

17 477 U.S. 242, 252-56 (1986).  Facts are "material" if they "might

18 affect the outcome of the suit under the governing law."

19 *Campbell*, 138 F.3d at 782 (quoting *Anderson*, 477 U.S. at 248).

20 The nonmoving party cannot simply rest on its allegations without

21 any significant probative evidence tending to support the

22 complaint. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.

23 2001).[T]he plain language of Rule 56(c) mandates the entry of

24 summary judgment, after adequate time for discovery and upon

25 motion, against a party who fails to make a showing sufficient to

26 establish the existence of an element essential to the party's

27 case, and on which that party will bear the burden of proof at

28 trial.  In such a situation, there can be "no genuine issue as to

any material fact," since a complete failure of proof concerning
an essential element of the nonmoving party's case necessarily
renders all other facts immaterial. *Celotex Corp. v. Catrell*, 477
U.S. 317, 323 (1986).  The more implausible the claim or defense
asserted by the nonmoving party, the more persuasive its evidence
must be to avoid summary judgment. *See United States ex rel.
Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1996).
Nevertheless, the evidence must be viewed in a light most
favorable to the nonmoving party. *Id.; Anderson*, 477 U.S. at 255.
A court's role on summary judgment is not to weigh evidence or
resolve issues; rather, it is to determine whether there is a
genuine issue for trial. *See Abdul-Jabbar v. G.M. Corp.*, 85 F.3d
407, 410 (9th Cir. 1996).

### 4.   EVIDENTIARY OBJECTIONS

Defendant objects to Exhibit 3 and 8, attached to the
Declaration of Timothy R. Sullivan in support of their Opposition
to Travelers' Motion. *See* Doc. 54, Sullivan Decl., Exhibit 3 and
8.  Defendant objects pursuant to Federal Rules of Civil
Procedure 56(e): "A supporting or opposing affidavit must be made
on personal knowledge, set out facts that would be admissible in
evidence, and show that the affiant is competent to testify on
the matters stated. If a paper or part of a paper is referred to
in an affidavit, a sworn or certified copy must be attached to or
served with the affidavit. The court may permit an affidavit to
be supplemented or opposed by depositions, answers to
interrogatories, or additional affidavits." Defendant states
that Mr. Sullivan did not sign or was otherwise not the creator
or recipient of any of the documents attached to Exhibit 3 and 8

1  and has provided no facts from which the Court can infer that he

2  has personal knowledge sufficient to authenticate the documents.

3       **A.   Exhibit 3, Travelers' Impact Notes**

4       Exhibit 3 contains relevant portions of Travelers' claim

5  file, the Impact Notes.  The declaration states that the

6  documents were produced by Defendant Travelers in response to

7  discovery requests.  The Impact Notes themselves that are bate-

8  stamped HER CLM000011-000579.  Once authenticated, the Impact

9  Notes are Travelers' business records under Fed. R. Evid. 803(6),

10 that document its handling of Plaintiffs' claims and are party

11 admissions, both exceptions to the hearsay rule.

12      Defendant's objection to Exhibit 3, pursuant to Fed. R. Civ.

13 P. 56(e) is OVERRULED.

14      **B.   Exhibit 8, Gilstrap's Document Production**

15      The declaration states that Exhibit 8 contains relevant

16 portions of documents produced by Gilstrap Cleaning and

17 Restoration in response to Defendant's deposition subpoena along

18 with production of documents served in this action.  Other than

19 the statement that the documents were produced by Gilstrap in

20 response to Defendant's deposition subpoena no other identifying

21 statements or documentation is provided.  Plaintiffs do not

22 provide the discovery subpoena request or corresponding

23 deposition testimony from Gilstrap's authenticating the

24 documents.  No other documentation, besides the Gilstrap

25 documentation that are bate-stamped 000001-000228.

26      Defendant's objection to Exhibit 8, pursuant to Fed. R. Civ.

27

28

**44**

1    P. 56(e) is SUSTAINED.[6]

2                        **5.   DISCUSSION**

3    **A.   BREACH OF CONTRACT AND COVENANT OF GOOD FAITH AND FAIR
          DEALING**

4
         Plaintiffs' Complaint alleges causes of action for breach of

5    contract and bad faith under the Policy covering their Property

6    from the water loss claim of December 14, 2004.  A breach of

7    contract requires Plaintiffs to prove the following elements: (1)

8    the existence of a contract, (2) performance or excuse for non-

9    performance, (3) breach, and (4) damage. *Smith v. Royal Mfg. Co.,*

10   185 Cal.App.2d 315, 325, 8 Cal.Rptr. 417 (1960).

11
         Furthermore, there is an implied covenant of good faith and

12   fair dealing in every contract that neither party will do

13   anything that will injure the right of the other to receive the

14   benefits of the agreement. *Comunale v. Traders & General Ins.*

15   *Co.,* 50 Cal.2d 654, 658, 328 P.2d 198 (1958).  This principle

16   applies equally to insurance policies. *Kransco v. American Empire*

17   *Surplus Lines Ins. Co.*, 23 Cal.4th 390, 400, 97 Cal.Rptr.2d 151

18   (2000).

19
         Tort damages may be available when an implied covenant claim

20   arises out of an insurer's breach of contractual obligations. *Id*.

21   The gravamen of a claim for breach of the implied covenant is the

22   insurer's refusal, without proper cause, to compensate the

23   insured for a covered loss or its unreasonable delay in making

24

25   _____

26        [6] Defendant also objects on similar grounds to Exhibit 12
     and 13 of the Sullivan Decl. (Doc. 54)  These exhibits were not
27   used in any of the relevant facts cited in the fact section to
     this order.  Therefore, any evidentiary rulings on these exhibits
28   are not necessary in this order.

                                 45

payments due. *Waters v. United Services Auto. Assn.*, 41
Cal.App.4th 1063, 1070, 48 Cal.Rptr.2d 910 (1996).

To establish breach, Plaintiffs must show that (1) benefits
due under the policy were withheld; and (2) the reason for
withholding benefits was unreasonable or without proper cause.
*Love v. Fire Ins. Exchange*, 221 Cal.App.3d 1136, 1151, 271
Cal.Rptr. 246 (1990)   "Where benefits are fully and promptly
paid, no action lies for breach of the implied covenant no matter
how hostile or egregious the insurer's conduct toward the insured
may have been prior to such payment ... absent an actual
withholding of benefits due, there is no breach of contract and
likewise no breach of the insurer's implied covenant." *Id*. at
1151-1152, fn. 10.

The gravamen of tortuous behavior in a so-called "bad faith"
suit is the *unreasonable* withholding of benefits due under the
policy by the carrier "measured against its duty arising under
the implied covenant of good faith and fair dealing present in
every insurance contract." *Blake v. Aetna Life Ins. Co.*, 99
Cal.App.3d 901, 918, 160 Cal.Rptr. 528 (1978).   "In every
insurance policy there is implied by law a covenant of good faith
and fair dealing. [citation]   This implied obligation requires an
insurer to deal in good faith and fairly with its insured in
handling an insured's claim against it." *Gruenberg v. Aetna Ins.
Co.*, 9 Cal.3d 566, 574, 108 Cal.Rptr. 480 (1973) (citations and
quotations omitted).   The reasonableness of an insurer's handling
of the case can only be measured by the particular facts of each
case. *Allen v. Allstate Ins. Co.*, 656 F.2d 487, 489 (9th Cir.
1981) ("What is 'good faith' or 'bad faith' on an insurer's part

46

has not yet proved susceptible to pat legal definition.   An
insurer's 'good faith' is essentially a matter of fact.")

Defendant Travelers alleges that two elements of Plaintiffs
breach of contract claim are wholly unsupported by any evidence.
Defendant alleges that Plaintiffs cannot prove any "breach"
because there is no evidence of uncompensated loss of "business
property" or "paid rents or lost rents."  Defendant also alleges
that Plaintiffs cannot provide any evidence of damages for this
alleged breach.

Plaintiffs rejoin that Defendant Travelers did not pay for
all benefits due under the Policy, including not paying for items
of personal property that were of sentimental value, nor Business
Property, including, an office shredder, fax machine and several
boxes of business documents, nor the loss of rent received from
the renting of their home office.  As evidence Plaintiffs cite to
lists of items of sentimental value in which Travelers never
requested Plaintiffs place a value on and, therefore, as a
result, such items were not paid for under the Policy.
Plaintiffs also cite as evidence the lack of payment for office
equipment and office documents destroyed by contamination or
through the process of decontamination.  Plaintiffs also provide
evidence that they received rent from their home office by their
company, Hergie Associates.

Defendant Travelers also alleges that there is no evidence
of bad faith because Travelers did not unreasonably withhold
policy benefits from Plaintiffs and did not delay in making
payments.  Defendant also argues that it is not responsible for
Randrup's, the water extraction company, water extraction and

clean-up methods.

"The ultimate test of bad faith liability in first party cases is whether the refusal to pay policy benefits, or alleged delay in paying, was unreasonable." *Carlton v. St. Paul Mercury Ins. Co.*, 30 Cal.App.4th 1450, 1456, 36 Cal.Rptr.2d 229 (1994). "While the reasonableness of an insurer's claims handling conduct is ordinarily a question of fact, it becomes a question of law where the evidence is undisputed and but one inference can be drawn from the evidence." *Id*.
Travelers has a special duty to plaintiffs of good faith and fair dealing.

Plaintiffs rejoin that there is evidence that Defendant Travelers did not promptly pay for all ALE (Additional Living Expenses) benefits unreasonably delayed paying for benefits due, including benefits for Additional Living Expenses such as hotel and food expenses incurred when removed from their home after it was contaminated and damaged by the water loss that involved sewage.  Travelers further did not pay for all personal property lost by Hergenroeders, specifically items of sentimental value because Travelers failed to ask Plaintiffs to place a dollar value on the items.  Travelers also did not pay all business property lost including an office fax machine, office shredder, destroyed after contamination, a copier, cleaned after being contaminated but non-working, and various business records that were destroyed in the process of the contamination clean-up. Business records not paid for include client files, business forms Plaintiffs developed over the years, business receipts, tax

returns, business signs, business cards, marketing materials and about 10 Bekin boxes.  Plaintiffs also provide testimony that they received rental income of $500/month from their home office by their company, Hergie Associates, that Travelers refused to pay.

Plaintiffs also cite the following as evidence that Travelers were <u>inadequate in their investigation of Plaintiffs' claim</u>:

> 1. Mr. Permeneter failed to ask Plaintiffs if their toilet water contained feces or urine.
>
> 2. Mr. Permeneter disregarded his typical procedures of retaining an industrial hygienist to test for contamination if there was "any doubt" whether the water was from a clean source.
>
> 3. Mr. Permeneter and Mr. Krebs witnessing the emergency clean-up by Randrup "fell below industry standards," including failing to use tarps or plastic to contain spread of contaminants and said nothing. Also was silent with regard to the unfiltered and unvented fans that spread contaminants throughout home.
>
> 4. Ms. Sciascia failure to ask Plaintiffs to put a value on their items they listed as having sentimental value.
>
> 5. Ms. Sciascia's failure to inquire on what kind of contamination and health hazards posed to the remediation company after they told her they found "more contamination."  Ms. Sciascia's failure to inquire further, including the health hazards posed, after the industrial hygienist reinspected and found "high counts of bacteria".  And Ms. Sciascia's failure to inquire further, after the industrial hygienist conducted "post remediation sampling" and had given the all clear, and then the remediation company called to discuss "mold and black water" and the spotting of "additional moisture" in various rooms indicating "extreme damage."

Plaintiffs cite the following as evidence that Travelers <u>failed to pay and inform Plaintiffs of all policy benefits</u>,

similar to *Baron*, *Campbell* and *Hangarter*:

> 1. Travelers paid Plaintiffs a little over $400 of their nearly $4,000 motel bills.
>
> 2. Travelers failure to pay Plaintiffs for items of sentimental value because they failed to ask Plaintiffs to place a value when they did not know how to calculate a "price" for the items.
>
> 3. Mr. Permeneter failure to explain to Plaintiffs the availability of coverage under "Business Property" for their home office items and loss of rent, even after Mr. Permenter inspected their home office.
>
> 4. Travelers failure to pay for "Business Property" that was listed as destroyed on the remediation company's list of item desotryed, including, office machinery (fax machine, shredder), client files, business forms developed by Plaintiffs over many years, business receipts, tax returns, business signs, cards, etc., destroyed from contaminated or through the process of cleaning the contamination .
>
> 5. Mr. Permenter failure to disclose benefits under the "Fair Rental Value" coverage for the their lost rental income from their home office of $500/month for ten months, even after Plaintiffs sent a letter informing Travelers that they received rent from their company, Hergie Associates.

Plaintiffs also cite the following as evidence that Travelers had <u>no procedures for handling claims</u>:

> 1. Travelers failed to adopt written guidelines to be followed in a water loss claim involving contamination from human feces, urine or waste.
>
> 2. Travelers failed to train Ms. Sciascia, the "person most qualified" in Travelers regarding water loss claims involving human feces, urine or waste, the health hazards of bacteria and mold, including asking the industrial hygienist whether bacteria and mold in Plaintiffs home created a health hazard).

Plaintiffs also cite the following as evidence that Travelers <u>consciously disregarded safety and health of Plaintiffs</u>:

> 1. Travelers' failure to retain an industrial hygienist to test for contamination if there was "any doubt"

whether the water was from a clean.

2. Ms. Sciascia's failure to request more information, including the type of contamination, from the remediation company, after they told her they found "more contamination" in Plaintiffs' home.

3. Ms. Sciascia's failure to inquire further, including on whether it would pose any health hazards to Plaintiffs, after the industrial hygienist reinspected the home and found "high counts of bacteria."

4. Ms. Sciascia's failure to inquire further and failing to contact anyone for further testing, after the industrial hygienist had completed its "post remediation sampling" and had given his all clear, and the remediation company called to discuss "mold and black water" and "additional moisture found in various rooms" and "extreme damage."

Plaintiffs have provided sufficient evidence of material issues of triable facts to survive a summary judgment motion on their breach of contract and bad faith claims.

Defendant's motion for summary judgment regarding Plaintiffs' breach of contract claim is DENIED.

Defendant's motion for summary judgment regarding Plaintiffs' bad faith claim is GRANTED.

B.   PUNITIVE DAMAGES

Defendant Travelers argues that Plaintiffs' punitive damages claim fails as a matter of law because there is no evidence that Travelers acted with the requisite malice, oppression, fraud so as to justify the imposition of punitive damages and Plaintiffs cannot assert that Ms. Sciascia is a managing agent to find Travelers liable for punitive damages.

"In order to establish that an insurer's conduct has gone sufficiently beyond mere bad faith to warrant a punitive award, it must be shown by clear and convincing evidence that the

insurer has acted maliciously, oppressively or fraudulently."
*Mock v. Michigan Millers Mutual Ins. Co.*, 4 Cal.App.4th 306, 328,
5 Cal.Rptr.2d 594 (1992).  Liability for punitive damages is
governed by California Civil Code § 3294 which defines malice,
oppression, and fraud:

> (1) "Malice" means conduct which is intended by the
> defendant to cause injury to the plaintiff or
> despicable conduct which is carried on by the defendant
> with a willful and conscious disregard of the rights or
> safety of others.
> (2) "Oppression" means despicable conduct that subjects
> a person to cruel and unjust hardship in conscious
> disregard of that person's rights.
> (3) "Fraud" means an intentional misrepresentation,
> deceit, or concealment of a material fact known to the
> defendant with the intention on the part of the
> defendant of thereby depriving a person of property or
> legal rights or otherwise causing injury.

Cal.Civ.Code § 3294.  "Punitive damages for failure to pay or
properly administer an insurance claim are ordinarily, as in this
case, based on 'malice' or 'oppression,' rather than on the third
possible ground for the award, 'fraud.'  Both 'malice' and
'oppression' are defined in Civil Code section 3294 as involving
'despicable conduct,' which in the case of malice 'is carried on
by the defendant with a willful and conscious disregard of the
rights or safety of others,' and as to oppression is 'conduct
that subjects a person to cruel and unjust hardship in conscious
disregard of that person's rights." *Tomaselli v. Transamerica
Ins. Co.*, 25 Cal.App.4th 1269, 1286-87, 31 Cal.Rptr.2d 433
(1994).  "It has been examined many times in appellate decisions,
and we but summarize.  First, simple breach of contract, no
matter how willful and hence tortious, is not ground for punitive
damages.  Such damages are accessible only upon a showing that

52

the defendant 'act[ed] with the intent to vex, injure, or annoy.' *Id.* at 1286, quoting *Neal v Farmers Ins. Exchange*, 21 Cal.3d 910, 922, 148 Cal.Rptr. 389 (1978).  The law does not favor such damages unless there is the requisite showing of malice, oppression or fraud. *Beck v. State Farm Mut. Auto. Ins. Co.*, 54 Cal.App.3d 347, 126 Cal.Rptr. 602 (1976) (they should be granted with the greatest caution).

        I. "Managing Agent"

        Defendant Travelers argues that Plaintiffs can only seek punitive damages against Travelers on the basis of imputed liability for the conduct of its employees and agents.  Defendant argues that here, Plaintiffs have no admissible evidence that any of Travelers' officers, directors, or managing agents ratified any malicious, oppressive or fraudulent conduct of its claim adjusters.

        California Civil Code § 3294(b) limits an employer's liability to the following situations:

> An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had <u>advance knowledge</u> of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. <u>With respect to a corporate employer</u>, *the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation*.

Cal. Civ. Code § 3294(b) (emphasis added).

        With respect to corporate employers, liability is limited to imputation of conduct to the officers, directors or managing

53

1  agents of the corporation because "[t]his is the group whose

2  intentions guide corporate conduct." *Cruz v. HomeBase*, 83

3  Cal.App.4th 160, 167, 99 Cal.Rptr.2d 435 (2000).  "By so

4  confining liability, the statute avoids punishing the corporation

5  for malice of low-level employees which does not reflect the

6  corporate 'state of mind' or the intentions of corporate leaders.

7  This assures that punishment is imposed only if the corporation

8  can be fairly be viewed as guilty of the evil intent sought to be

9  punished." *Id.*

10      The California Supreme Court has defined "managing agent"

11  within the meaning of California Civil Code § 3294(b) to be an

12  employee with "broad discretion" that exercises "policymaking

13  authority." *Egan v. Mutual Omaha Ins. Co.*, 24 Cal.3d 809, 823,

14  169 Cal.Rptr. 691 (1979).  "[T]he critical inquiry is the degree

15  of discretion the employees possess in making decisions that will

16  ultimately determine corporate policy.  When employees dispose of

17  insureds' claims with little if any supervision, they possess

18  sufficient discretion for the law to impute their actions

19  concerning those claims to the corporation." *Id.* at 822-23.  In

20  *White v. Ultramar, Inc.*, 21 Cal.4th 563, 88 Cal.Rptr.2d 19

21  (1999), the California Supreme Court provided further guidance

22  stating:

23          In order to demonstrate that an employee is a true
           managing agent under section 3294, subdivision (b), a
24          plaintiff seeking punitive damages would have to show
           that the employee exercised substantial discretionary
25          authority over significant aspects of a corporation's
           business.
26
27  21 Cal.4th at 577.

28      Plaintiffs rejoin and argue that there is substantial

**54**

evidence that Ms. Sciascia is a "managing agent" under the definitions provided in the *Egan* and *White* decisions. *Egan v. Mutual Omaha Ins. Co.*, 24 Cal.3d 809, 822-23, 169 Cal.Rptr. 691 (1979) involved a case brought by the insured against the insurer. The Court in determining whether the insurer's claims manager and claims adjuster could be considered "managerial employees" to hold their actions -- failing to investigate adequately claims before denying insurance coverage --- imputed to the insurer, stated "[t]he determination whether employees act in a managerial capacity, however, does not necessarily hinge on their 'level' in the corporate hierarchy. Rather, the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy. When employees dispose of insureds' claims with little if any supervision, they possess significant discretion for the law to impute their actions concerning those claims to the corporation." *Egan*, 24 Cal.3d at 822-23. The Court noted that one employee, had a business card that identified his title as a "Manager", the employee testified he was a manager of the Los Angeles claims department and had ultimate supervisory and decisional authority over disposition of all claims, like that of plaintiff's in the suit, in the Los Angeles office. Although the second employee testified he had directions from upper levels, there was little support for his claim, offered to discount the allegation of being a "managing agent" and with respect to the plaintiff's claim possessed broad discretion. The court stated that the "[t]he authority exercised by McEachen and Segal necessarily

55

results in the ad hoc formulation of policy." *Id.* at 823.

The Court in *White v. Ultramar*, 21 Cal.4th 563, 566-67, 88 Cal.Rptr.2d 19 (1999), decided after Cal. Civ. Code § 3294 was amended, followed *Egan,* and stated that the term "managing agent" includes "only those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy."   Where a supervisory employee was in charge of supervising, eight stores, with sixty-five employees, comprising a significant aspect of the company's business and the company testified they delegated, most, if not all responsibility for running the stores to the supervisory employee, provided sufficient evidence to establish the supervisory employee exercised substantial discretionary authority over vital aspects of the business, therefore deemed a "managing agent" under Cal.Civ.Code § 3294, subd. (b).

Plaintiffs argue here the following is evidence makes Ms. Sciascia a managing agent:

> 1. Travelers failed to adopt written guidelines to be followed in a water loss claim involving contamination from human feces, urine and waste. (PSAUF 27-28)
>
> 2. Despite lack of written guidelines, Ms. Sciascia did not need approval from any supervisor for any aspect of claim handling, unless dollar amount exceeded $60,000. (PSAUF 200)
>
> 3. Despite her authority, all Ms. Sciascia's files were reviewed monthly by her supervisor, Unit Manager John Wolford. (PSAUF 198)
>
> 4. Office Manager Gene Wilson reviewed and was aware of all claims that exceed $100,000. (PSAUF 199)
>
> 5.  After Plaintiffs complained of claim handling, Travelers allowed Ms. Sciascia to write response to

Department of Insurance. (PSAUF 201)

Ms. Sciascia does not have the authority to decide the disposition of Plaintiffs' claim, since approval of all decisions exceeding $60,000 require higher supervisory approval. (PAUSF 200)  Plaintiffs' claim was over $300,000.  Ms. Sciascia's authority over Plaintiffs' claim amounts to approximately 20% of the total amount of Plaintiffs' claims.  The undisputed facts demonstrate that Ms. Sciascia could not have had decisional authority on Plaintiffs' claim as she is a lower level claims handler with authority not exceeding $60,000.  She has no policy making managerial authority that rises to the level of managing agent.  Plaintiffs have provided no other evidence of any other Travelers' employees who had the requisite leave of authority to qualify as a "managing agent" within the meaning of California Civil Code § 3294(b).  Plaintiffs must prove by clear and convincing evidence that a "managing agent" of Travelers was consciously aware of the alleged wrongful conduct and expressly or impliedly ratified it.

Defendant's motion for summary judgment regarding Plaintiffs' request for punitive damages as to corporation Travelers is GRANTED.

C.   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Defendant contends that in regards to Plaintiffs' claim for intentional infliction of emotional distress (IIED), Plaintiffs have failed to provide evidence that it intentionally caused or with reckless disregard of the probability of causing emotional distress engaged in "outrageous conduct."  Plaintiffs have failed

57

to provide evidence that they suffered severe or extreme emotional distress to support an IIED claim.  And Plaintiffs have failed to provide evidence that the actual and proximate cause of the emotional distress was Defendant's outrageous conduct.

Under California law, the elements of a claim for intentional infliction of emotional distress are:

> (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.

*Christensen v. Superior Court,* 54 Cal.3d 868, 903, 2 Cal.Rptr.2d 79 (1991), quoting *Davidson v. City of Westminister*, 32 Cal.3d 197, 209 (1982).  "Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.*

Plaintiffs rejoin that Travelers committed a series of acts, any one of which would be sufficient to allow the Hergenroeder's IIED claim to go the jury.  Further, California case law provides examples of IIED claims against an insurance company for threatened and actual bad faith refusals to make payments under the policy. *Fletcher v. Western Natl. Life Ins. Co.*, 10 Cal.App.3d 376, 89 Cal.Rptr. 78 (1970) (an insurer's intentional conduct and wanton and reckless disregard of consequences to plaintiff in delaying payments of approved benefits vital to the support of plaintiff and her children supported an IIED claim); *Hernandez v. General Adjustment Bureau,* 199 Cal.App.3d 999, 245 Cal.Rptr. 288 (1988) (an insurer's ignoring of medical evidence

that insured could not work and withholding information from the insured's own doctors examining insured and as result cutting off disability payments on the basis of those doctors' report); *Little v. Stuyvesant Life Ins. Co.*, 67 Cal.App.3d 451, 136 Cal.Rptr. 653 (1977).

As to severe emotional distress in an IIED claim, the court in *Fletcher v. Western Natl. Life Ins. Co.*, 10 Cal.App.3d 376, 89 Cal.Rptr. 78 (1970), stated as follows:

> It appears, therefore, that in this context, "severe" means substantial or enduring as distinguished from trivial or transitory. Severe emotional distress means, then, emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it.

10 Cal.App.3d at 397.  Further, it is for the Court to determine whether on the evidence provided severe emotional distress can be found and for the jury to determine, whether it has in fact existed. *Id.* (citing Rest.2d Torts § 46, com. *j.*)

"It is true that plaintiff's testimony did not indicate that he suffered any traumatic emotional distress of the character of shock, horror or nausea, but the requisite emotional distress may consist of any highly unpleasant mental reaction such as fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment or worry." *Id.*  "Moreover, as pointed out previously, the duration of the emotional distress is one of the factors to be considered in determining its severity. (Rest.2d Torts, § 46, com. j., supra), and the jury could reasonably infer that plaintiff's worry and anxiety persisted for many months following defendants' letter of August 25, 1966, during their continued recalcitrance." *Id.* at 398.

1    The Court in *Hernandez v. General Adjustment Bureau*, 199
2 Cal.App.3d 999, 245 Cal.Rptr. 288 (1988)*,* held on appeal that
3 plaintiff had sufficiently alleged an IIED claim*:* "Appellant
4 alleges, in essence, that, knowing her susceptibility to profound
5 mental distress, and of her repeated attempts at suicide, as a
6 result of the incidents which caused her disability, respondents
7 intentionally delayed payments of approved benefits vital to the
8 support of appellant and her three children. Under the standards
9 set forth above, these allegations are sufficient to state a
10 cause of action for intentional infliction of emotional
11 distress." 199 Cal.App.3d at 1007.

12    In *Little v. Stuyvesant Life Ins. Co.*, 67 Cal.App.3d 451,
13 136 Cal.Rptr. 653 (1977), on appeal, the Court found, among other
14 things, that plaintiff's testimony on emotional distress,
15 including anger and depression, caused by the insurer's
16 termination of payments, and the evidence that plaintiff had
17 attempted suicide as a result of the her financial problems,
18 constituted substantial evidence to support jury's implied
19 finding that plaintiff suffered severe emotional distress.
20 Plaintiff had brought suit against group disability insurer for
21 compensatory and punitive damages for intentional infliction of
22 emotional distress as a result of the insurer's termination of
23 plaintiff's disability payments.  In affirming the judgment which
24 found the insurer liable for compensatory and punitive damages,
25 the court noted that it appeared that defendant purposely ignored
26 the great bulk of the medical information it had and withheld it
27 from selected physicians who examined plaintiff, and sought to

28

justify termination of benefits under the policy.  The jury was justified in finding that insurer had acted with reckless disregard of the probability of causing plaintiff emotional distress in terminating the benefits. *Id.* at 467.[7]

Plaintiffs' cite the following as evidence of "outrageous" conduct done with reckless disregard or with intent to cause Plaintiffs to suffer severe or extreme emotional distress and which the actual and proximate cause of the emotional distress caused by the outrageous conduct:

1) Mr. Permenter's failure to ask if the toilet water that flooded Plaintiffs' home contained any feces or urine. (PSAUF 68-71, 78-83)

2) Mr. Krebs informing Plaintiffs that it was safe to stay in their contaminated home. (PSAUF 85-87)

3) Mr. Permenter disregarding his procedures requiring him to retain an industrial hygienist to test for contamination if there was any doubt whether the water was from a clean source. (PSAUF 85-108)

4) Mr. Permenter and Mr. Krebs viewing the emergency clean-up company's progress, and saw that it fell "below industry standards," including failing to use tarps or plastic to contain the spread of contaminants, and unvented fans spreading contaminants throughout the house and saying nothing. (PSAUF 46-67)

5) Travelers waiting twelve (12) days to contact an industrial hygiene company to test for contamination after halting the emergency clean-up work. (PSAUF 91-107)

---

[7] Upon receiving the letter terminating plaintiff's disability payments, plaintiff became very deeply depressed and angry.  She had ,as a result of termination of benefits, sell her beloved home against her wishes for a low price.  She became despondent and overdosed on valium.  Eventually plaintiff had to live in public housing for low income, disabled persons.  "It is inferable that over a period of several years plaintiff suffered intense grief, chagrin, disappointment, worry, humiliation, embarrassment and anger." *Id.* at 462-63.

6) Travelers' failure to return Plaintiffs' phone calls during Mr. Permenter's vacation. (PSAUF 102-106)

7) Travelers' denial of receiving Plantiffs' faxed gas and food receipts and failure to process motel and food receipts after being told by Plaintiffs their credit cards were "maxed out." (PSAUF 138-148)

8) Travelers' payment only $400 of a $4000 motel bill. (PSAUF 146-147)

9) Ms. Sciascia's failure to inform Plaintiffs' that items of sentimental value could be compensated for if they provided a value. (PSAUF 166-174)

10) Ms. Sciascia's failure to inquire further in response to contamination at Plaintiffs' home (including failing to inquire further after the industrial hygienist had reinspected the home and found "high counts of bacteria" and after the industrial hygienist had performed post remediation sampling and given an all clear, the remediation company called to discuss "mold and black water" and "additional moisture found in various rooms" and "extreme damage"). (PSAUF 113-122)

11) Travelers' failure to explain the "Business Property" coverage, because they did not see any damage. (PSAUF 123-124, 175-77)

12) Despite knowledge that the remediation protocol stated all porous items in the home had to be destroyed, and receiving a list from the remediation company of items removed from Plaintiffs' home office, Travelers failed to pay for "Business Property" (including office shredder, fax machine, client files, business forms developed over the years of Plaintiffs' business, business receipts, tax returns, business signs, business cards, marketing materials and other business records, including about 10 Bekin boxes destroyed due to contamination).(PSAUF 175-191)

13) Mr. Permenter's failure to explain the "Fair Rental Value" coverage provided to Plaintiffs under their policy despite receiving a letter from Plaintiffs explaining that the corporation paid them for the home office. (PSAUF 130)

14) Mr. Wolford's statement to Plaintiffs that nothing related to the business was covered. (PSAUF 135-137)

15) Travelers' failure to adopt written guidelines to be followed in water loss claims involving contamination from human feces, urine or waste. (PSAUF 27-28)

16) Although Ms. Sciascia is the "person most qualified"

1

2

3

4

> from Travelers regarding claims handling procedures for
> water loss claims involving human feces, urine or waste, she
> has never been trained regarding whether bacteria or mold
> could constitute a health hazard, and never asked the
> industrial hygienist that found the bacteria and mold in
> Plaintiffs' home. (PSAUF 196-207)

5

6

7

8

9

10

11

12

13

    Without addressing whether the evidence provided constitutes
"outrageous conduct" such that it would cause severe emotional
distress, Plaintiffs notably fail to point to any evidence of
severe emotional distress, no deposition testimony, no
declarations from any of the Plaintiffs nor from any of
Plaintiffs' medical doctors, and no medical records were provided
evidencing severe emotional distress.  Plaintiffs also do not
address how any alleged extreme emotional distress was caused by
Defendants' outrageous conduct.

14

15

16

17

18

19

    However, the Court is suffering from information overload.
The facts presented do not individually show extreme and
outrageous conduct, however this decision can be better resolved
at the close of Plaintiffs' evidence.  Defendant's motion for
summary judgment regarding Plaintiffs' intentional infliction of
emotional distress claim is DENIED.

20

D.   NEGLIGENCE AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

21

22

23

24

25

26

27

28

    Defendant Travelers argues that as a matter of law
Plaintiffs cannot maintain claims for negligent claims handling
and negligent infliction of emotional distress (NIED) because
there is no cause of action for "negligent claims handling."  And
because negligent infliction of emotional distress is not a
separate tort, but part of negligence, and no claim for
negligence can be maintained, Plaintiffs' negligent infliction of
emotional distress claim also fails.

Generally California courts have not permitted general negligence causes of action in insurance-related cases. *Sanchez v. Lindsey Morden Claims Service, Inc.*, 72 Cal.App.4th 249, 254 (1999) states the general view of the California courts' view towards general negligence causes of actions against insurers: "negligence is not among the theories of recovery generally available against the insurers." *Id*; *see also Benavides v. State Farm Ins. Co.*, 136 Cal.App.4th 1241, 39 Cal.Rptr.3d 650 (2006) (the California court reviewed California case law to determine whether insurer could be held liable for negligent investigation absent covered loss under the policy.  It found it could not and discussed the limited circumstances where tort damages were permitted in contract cases, including in the insurance context where tort damages have been permitted for a breach of the covenant of good faith and fair dealing); *see also Everett Associates Inc. v. Transamerica*, 159 F.Supp.2d 1196, 1204 (N.D. Cal. 2001).[8]

Plaintiffs' claim for negligent infliction of emotional

---

[8] *Everett Associates Inc. v. Transamerica*, 159 F.Supp.2d 1196, 1204 (N.D. Cal. 2001) applied California law to determine whether a negligent investigation claim supports a claim for negligence separate from a duty to defend or an implied covenant of good faith and fair dealing.  The Court determined that it did not.  "Plaintiffs do not cite a single example where a court has found an insurer's failure to properly investigate capable of supporting a separate negligence cause of action under California law.  Instead, Plaintiffs urge the Court to rely on fundamental tort principles to recognize its negligence claim.  The Court finds doing so would be an expansion unwarranted by California case law and declines to do so." *Everett*, 159 F.Supp.2d at 1204.

distress claim is presented under the "direct victim" theory.[9] *Burgess v. Superior Court,* 2 Cal.4th 1064, 1071, 9 Cal.Rptr.2d 615 (1992). In *Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.* 48 Cal.3d 583, 770 P.2d 278 (1989), the court stated that damages for emotional distress are recoverable "when they result from the breach of a duty owed the plaintiff that is assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a relationship between the two." 48 Cal.3d at 590. Generally, "there is no duty to avoid negligently causing emotional distress to another, ... " *Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th 965, 984, 25 Cal.Rptr.2d 550 (1993). Therefore, "unless the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object, recovery is available only if the emotional distress arises out of the defendant's breach of some other legal duty and the emotional distress is proximately caused by that breach of duty." *Id.* at 985; *Erlich v. Menezes*, 21 Cal.4th 543, 555, 981 P.2d 978 (1999). A legal duty "may be imposed by law, be assumed by the defendant, or exist by virtue of a special relationship." *Potter, supra*, 6 Cal.4th at 985; *Marlene F.*, supra, 48 Cal.3d at 590.

In *Johnson v. Mutual Ben. Life Ins. Co.,* 847 F.2d 600 (9th Cir. 1988), a Ninth Circuit court decision where an insured brought an NIED claim against the insurer as well as a claim for

---

[9] Whether NIED claims are permitted, California law splits from among cases brought against the insurer by the insured, a "direct victim" claim versus suits brought by third-parties, a "bystander claim." The lack of a preexisting duty owed to third-parties often negates claims brought against an insurer by a third-party.

breach of the implied covenant of good faith and fair dealing.
The court held that genuine issues of material fact existed on
both claims to preclude summary judgment.

> Here, the following indicia of genuineness of Johnson's
> mental distress claim exist: Johnson was uninsurable
> because of her history of cancer; she received two
> incorrect termination notices; she was confronted with
> billing errors for two years; and she was required to
> seek psychiatric aid. Under Molien, these items are
> sufficient to raise a genuine issue of material fact as
> to whether Johnson in fact suffered serious emotional
> distress as a result of Mutual Benefit's negligent
> conduct. See 27 Cal.3d at 930-31, 167 Cal.Rptr. at 839,
> 616 P.2d at 821. In addition, the existence of an
> independent tort for breach of the implied covenant of
> good faith and fair dealing provides a further
> guarantee of genuineness. Id. at 926-27, 167 Cal.Rptr.
> at 837, 616 P.2d at 818-19 (noting traditional
> California rule that existence of independent cause of
> action provides guarantee of genuineness for emotional
> distress claim); Gilchrist, 803 F.2d at 1499;
> Commercial Cotton Co., 163 Cal.App. at 517, 209
> Cal.Rptr. at 555.

847 F.2d at 604. *See also Bogard v. Employers Cas. Co.,* 164
Cal.App.3d 602, 618, 210 Cal.Rptr. 578 (1985) (California case
where was party given leave to amend for a negligent infliction
of emotional distress claim)

    Damages for severe emotional distress, as required to
recover for NIED, can be recovered "when they [damages] result
from the breach of a duty owed the plaintiff that is assumed by
the defendant or imposed on the defendant as a matter of law, or
that arises out of a special relationship between the two."
*Christensen v. Sup. Ct. (Pasadena Crematorium),* 54 Cal.3d 868,
890, 2 Cal.Rptr.2d 79 (1991) (mortuaries owing duty to families
of decedents).  In a "direct victim" claim, recovery for serious
emotional distress is allowed when it is the "result of a breach
of duty owed that plaintiff that is assumed by the defendant or

66

imposed on the defendant as a matter of law, or that arises out of relationship between the two..." *Burgess v. Sup.Ct. (Gupta)*, 2 Cal.4th 1064, 1073, 9 Cal.Rptr.2d 615 (1992) (doctor-patient relationship).

Specifically, in insurance litigation suits, an action for NIED cannot be maintained if there is an absence of a duty of good faith and fair dealing. "[W]here the insurer owes no duty of good faith and fair dealing to a claimant, it also owes no duty giving rise to a claim of negligent infliction of emotional distress." *Coleman v. Republic Indem. Ins. Co. of Calif.*, 132 Cal.App.4th 403, 415-16, 33 Cal.Rptr.3d 744 (2005). Plaintiffs have alleged and have provided evidence of a triable issue of fact to survive the summary judgment challenge to their bad faith claim, therefore the presence of an existing duty will permit Plaintiffs' NIED claim to survive.

Defendant has only challenged Plaintiffs' NIED claim as a matter of law. Despite Defendant's argument in its Reply brief which argues that no evidence was provided by Plaintiffs to support an NIED claim, it did not raise such a challenge in its Motion for Summary Judgment. Plaintiffs noted this absence in their Opposition. Only in its Reply, did Defendant argue that there is a lack the evidence by Plaintiffs of emotional distress. Plaintiffs' failure to provide evidence on this claim is not sufficient reason to grant summary judgment in Defendant's favor for this reason.

For the following reason, Defendant's motion for summary judgment regarding Plaintiffs' negligent infliction of emotional

distress claims is DENIED, but GRANTED as to Plaintiffs'
negligence cause of action.

E.   NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
     (Claim brought by Steve and Julie Hergenroeder only.)

     Plaintiffs claim negligent interference with prospective
economic advantage.  Defendant Travelers argues that Plaintiffs
Steve Hergenroeder and Julie Hergenroeder have no evidence that
they were exposed to, or contracted, any communicable disease
during the adjustment of the claim.  And even if exposed, no
evidence that such exposure was caused by any acts or omissions
of Travelers or that they sustained damages.  Furthermore,
Defendant argues that Plaintiffs, in their Opposition pleading,
offered no legal or factual opposition to Travelers' motion for
summary judgment on their claim for negligent interference with
prospective economic advantage.

     Since Travelers has shown by undisputed facts that this
claim fails as a matter of law as a result of Plaintiffs' failure
to provide any evidence of a genuine issue of material fact,
summary judgment is granted in favor of Travelers.

     The tort of negligent interference with prospective economic
advantage is established where a plaintiff demonstrates that:

          (1) an economic relationship existed between the
          plaintiff and a third party which contained a
          reasonably probable future economic benefit or
          advantage to plaintiff;
          (2) the defendant knew of the existence of the
          relationship and was aware or should have been aware
          that if it did not act with due care its actions would
          interfere with this relationship and cause plaintiff to
          lose in whole or in part the probable future economic
          benefit or advantage of the relationship;
          (3) the defendant was negligent; and
          (4) such negligence caused damage to plaintiff in that
          the relationship was actually interfered with or

68

1
2

> disrupted and plaintiff lost in whole or in part the economic benefits or advantage reasonably expected from the relationship.

3
4

*North America Chemical Co. V. Superior Court*, 59 Cal.App.4th 764, 786, 69 Cal.Rptr.2d 466 (1997).

5
6
7

Defendant's motion for summary judgment regarding Plaintiffs' negligent interference with prospective economic advantage claim is GRANTED.

8   //
9   //
10  //
11  //
12  //
13  //
14  //
15  //
16  //
17  //
18  //
19  //
20  //
21  //
22  //
23  //
24  //
25  //
26  //
27  //
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the reasons set forth above,

(1) Defendant's motion for summary judgment regarding Plaintiffs' breach of contract claim is DENIED.

(2) Defendant's motion for summary judgment regarding Plaintiffs' bad faith claim is DENIED.

(3) Defendant's motion for summary judgment regarding Plaintiffs' request for punitive damages is GRANTED.

(4) Defendant's motion for summary judgment regarding Plaintiffs' intentional infliction of emotional distress claim is DENIED.

(5) Defendant's motion for summary judgment regarding Plaintiffs' negligent infliction of emotional distress claim is DENIED.

(6) Defendant's motion for summary judgment regarding Plaintiffs' negligence claim is GRANTED.

(7) Defendant's motion for summary judgment regarding Plaintiffs' negligent interference with prospective economic advantage claim is GRANTED.

IT IS SO ORDERED.

Dated: ___ April 21, 2008 ___                      _____ /s/ Oliver W. Wanger _____
                                                   UNITED STATES DISTRICT JUDGE